UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____ x

CITY OF ROSEVILLE EMPLOYEES'         :    Civil Action No. 1:20-cv-01822
RETIREMENT SYSTEM, Individually and on :
Behalf of All Others Similarly Situated,    :    CLASS ACTION
                                     :
              Plaintiff,             :    COMPLAINT FOR VIOLATION OF THE
                                     :    FEDERAL SECURITIES LAWS
       vs.                           :
                                     :
ALIGN TECHNOLOGY, INC., JOSEPH M.    :
HOGAN and JOHN F. MORICI,            :
                                     :
              Defendants.            :
                                     :    DEMAND FOR JURY TRIAL
_____ x

Plaintiff City of Roseville Employees' Retirement System ("plaintiff"), individually and on behalf of all others similarly situated, alleges the following based upon the investigation of plaintiff's counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Align Technology, Inc. ("Align" or the "Company"), as well as media reports, securities analyst research reports, press releases, and other public statements issued by, or about, the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a securities class action on behalf of purchasers of Align common stock between April 24, 2019 and July 24, 2019, inclusive (the "Class Period"), asserting claims under the Securities Exchange Act of 1934 (the "1934 Act") against Align and certain of the Company's executive officers.

2.     Align is a medical device company that designs, manufactures, and markets devices to treat misaligned teeth.  Its principal products are its line of Invisalign® ("Invisalign") clear dental aligners.

3.     Throughout the Class Period, Defendants made numerous materially misleading statements emphasizing the growth and performance of the Company's operations in China, the Company's most valuable market after the United States.  These statements included describing the "**_huge market opportunity_**" and "**_tremendous growth . . . in China, in particular_**," and characterizing the Company's increasing presence in China as "**_a big hit with our Chinese customers_**."[1]  These and other statements detailed herein were materially false and misleading because they materially overstated the Company's performance in China and omitted to disclose

---

[1]     Emphasis has been added unless otherwise noted.

material declines in Chinese demand for the Company's products and the deteriorating sentiment of Chinese consumers towards the Company's products.

4.      On July 24, 2019, after the market closed, Align issued a press release announcing its financial results for the second quarter of 2019, which reported significantly declining sales volumes for its Invisalign products and drastically reduced growth projections for the third quarter and full year of 2019.  Defendant Joseph M. Hogan, the Company's Chief Executive Officer ("CEO"), acknowledged that these problems were "'***primarily due to softness in China related to a tougher consumer environment***'" – a stark contrast from Defendants' Class Period representations about the Company's Chinese operations.

5.      In response, the price of Align stock dropped from $275.16 per share to $200.90 per share, a loss of nearly $75 per share, representing a one-day decline in market capitalization of over $5.4 billion.

## JURISDICTION AND VENUE

6.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), as well as SEC Rule 10b-5, 17 C.F.R. §240.10b-5.  This Court has jurisdiction over the subject matter of this action pursuant to §27 of the 1934 Act, 15 U.S.C. §78aa, as well as under 28 U.S.C. §1331.

7.      Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b).  Defendants transact business in this District, and a substantial number of the acts, omissions, and events giving rise to the claims asserted herein occurred in this District. Furthermore, the security that forms the subject of this action trades in this District on the NASDAQ.

8.      In connection with the acts and omissions alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the NASDAQ exchange.

## PARTIES

9.      Plaintiff City of Roseville Employees' Retirement System purchased Align common stock during the Class Period, as reflected in the attached Certification, which is incorporated herein by reference, and was damaged thereby.

10.      Defendant Align Technology, Inc. is a medical device company.  Align common stock trades on the NASDAQ exchange in New York City under the ticker symbol "ALGN."  Align is liable for the fraud alleged herein under §10(b) of the 1934 Act.

11.      Defendant Joseph M. Hogan ("Hogan") is the President and CEO of Align as well as a member of the Company's Board of Directors.  Hogan has held these positions at all relevant times throughout the Class Period.

12.      Defendant John F. Morici ("Morici") is the Chief Financial Officer of Align and Vice President of Global Finance.  Morici held these positions at all relevant times throughout the Class Period.

13.      Defendants Hogan and Morici are also referred to herein collectively as the "Individual Defendants."

14.      Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets, and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts, and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.

15.      It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading, and incomplete information conveyed in the Company's

public filings, press releases, and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the above officers of Align, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein. Said Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

16.     As officers and controlling persons of a publicly held company whose common stock was, and is, registered with the SEC pursuant to the 1934 Act, was traded on the NASDAQ, and was governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Align common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

17.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public, shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and

omissions therefrom, and were aware of their materially false and misleading nature.  Because of their Board membership and/or executive and managerial positions with Align, each of the Individual Defendants had access to the adverse undisclosed information about Align's financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Align and its business issued or adopted by the Company materially false and misleading.

18.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

19.     Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Align common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme: (i) deceived the investing public regarding Align's business, operations, management and the intrinsic value of Align common stock; and (ii) caused Plaintiff and other members of the Class to purchase Align common stock at artificially inflated prices.

**BACKGROUND**

20.     Defendant Align is a medical device company that designs, manufactures, and markets devices to treat misaligned teeth.  The Company's principal products are the Invisalign clear

dental aligners and the iTero® ("iTero") intraoral scanners, which are used to create digital imagery of patients' teeth for the purposes of diagnosing misalignment and fitting Invisalign aligners.

21.     Align has two operating segments: (i) "Clear Aligners," which markets Invisalign devices, and (ii) "Scanners and Services," which markets iTero scanners and related support services.  Sales of Invisalign products through the Clear Aligner segment – frequently measured in terms of "cases" sold – contribute the vast majority of the Company's revenues.  For example, for the 2018 fiscal year, the Clear Aligner segment produced approximately 86% of the Company's net revenues.  The Company markets Invisalign products through direct sales forces in four geographical markets:  North America; Asia Pacific ("APAC"); Europe, the Middle East, and Africa ("EMEA"); and Latin America.

22.     The APAC region includes China, which the Company acknowledges is its most important and lucrative market after the United States.  For example, at Align's Investor Day for 2018, hosted by several of the Company's senior executives – including the Individual Defendants – the Company's managing director for the APAC region stated that "Asia Pacific[ is] the fastest-growing region in the Align world" and that "China is the #2 largest market in Align world."

23.     The Company's business strategy includes a major focus on international expansion, with a particular emphasis on the Chinese market.  For example, the Company's annual report on Form 10-K for the 2018 fiscal year, filed with the SEC on February 28, 2019 ("2018 Annual Report"), included a section on "Business Strategy" that identified "International Expansion" as first among the Company's "strategic growth drivers."  That section explained that as "core countries within the . . . APAC regions continue to grow in both number of new Invisalign trained doctors and customer utilization," the Company "support[s] that growth through investments such as headcount, clinical support, education and advertising."

24.     To that end, the 2018 Annual Report represented that the Company would "continue to establish and expand additional order acquisition, treatment planning and manufacturing operations closer to our international customers."  Thus, during "the fourth quarter of 2018, [Align] began fabricating [its] aligners in [its] new manufacturing facility in Ziyang, China, [its] first aligner fabrication facility outside of Juarez, Mexico."  During 2018, the Company also began treatment planning operations using iTero scanners in Chengdu, China.  The 2018 Annual Report stated as follows:

> [The] scanner launch in China not only supports growth of our base Invisalign clear aligner business but also represents a major milestone for digital dentistry in China. As we continue to expand into markets where we sell our intra-oral scanners, we expect continued growth for the foreseeable future due to the size of the market opportunities and our relatively low market penetration in these regions.

25.     Further reflecting the Company's emphasis on expanding its operations in China, the Company also opened the Align University Training Institute in Shanghai, China, during the first quarter of 2019.  This facility for training physicians to use Align's products is the Company's second such facility in China.

26.     On January 29, 2019, Align issued a press release announcing its financial results for the previous year and its projections for full year 2019.  Concerning 2019, Defendant Morici stated that "[w]e expect total revenue growth for the company, Invisalign and iTero to be in the middle range of our long-term operating model of 20% to 30%," including as the result of "continued growth from international regions."  Defendant Morici stated further that "[w]e anticipate Invisalign volume to be in the middle of the range of our long-term model target of 20% to 30%."

27.     During the Class Period, the Company and the Individual Defendants made numerous materially false and misleading statements that highlighted the Company's growth and prospects in China, but failed to disclose that the Company was then experiencing a significant downturn in sales of and demand for Invisalign products in China.  Defendants' Class Period statements about the

strength of Align's business in China were materially false and misleading because they misrepresented the Company's growth trend in China and created the materially misleading impression that demand for Invisalign products in China remained steady and that the Company was not impacted by any downturn in consumer sentiment. Defendants' statements also allowed the Company's earlier projections for 2019 to remain live and uncorrected in the marketplace despite Defendants' knowledge of material undisclosed information that rendered them untrue and materially misleading as a result of undisclosed adverse market trends.

## MATERIALLY FALSE AND MISLEADING
## STATEMENTS ISSUED DURING THE CLASS PERIOD

28. The Class Period starts on April 24, 2019. On that date, Align issued a press release announcing its financial results for the quarter ended March 31, 2019. The Company also reported its expected outlook for the second quarter, stating in pertinent part as follows:

**Q2 2019 Business Outlook**

For the second quarter of 2019 (Q2'19), Align provides the following guidance:

- Net revenues in the range of $590 million to $600 million, up approximately 20% to 22% over the same period a year ago

- Invisalign case shipments in the range of 380 thousand to 385 thousand, up approximately 26% to 27% over the same period a year ago

- Operating margin in the range of 24.5% to 25.4%

- Diluted EPS in the range of $1.47 to $1.54

29. Also on April 24, 2019, after the earnings release, Align conducted a conference call with analysts and investors to discuss the earnings release and the Company's operations, which was led by Defendants Hogan and Morici (the "April 24th Conference Call"). During the April 24th Conference Call, Defendant Hogan described the Company's performance in China in positive terms, stating in pertinent part as follows:

For APAC, Q1 Invisalign volume increased 40.4% year-over-year, *reflecting continued strong growth from nearly all country markets led by China*, Japan and ANZ. *We also had a strong uptick in teenage patients in Q1 due in part to a teen promotion in China offered along with our teen edge sales program, intended to increase adoption of Invisalign treatment with teenagers*. We also had strong growth from GP dentists, which were [sic] up 63.5% year-over-year. On a sequential basis, Q1 was flat as expected due primarily to a seasonally lower period with the lunar new year holiday. *During Q1, we trained nearly 1,100 new doctors in APAC, over half of which were in China. We opened our second state-of-the-art training facility in China located in Shanghai. Our new manufacturing facility in Ziyang, China is continuing to ramp*.

30.     Also during the April 24th Conference Call, Defendant Hogan spoke in detail about the Company's various marketing and educational campaigns that were purportedly increasing awareness of Invisalign and its market penetration in China, stating in pertinent part as follows:

*In APAC, we continue to build awareness for Invisalign treatment through the use of paid media and influencer campaign[s]*, including expansion of our influencer program in the region and a pilot Invisalign First social media campaign to target parents of younger children. To leverage increasing consumer awareness and demand, we also began to expand the Invisalign Concierge program that connects interested consumers with Invisalign doctors for treatment in new countries. Globally, in the second half of the year, we will launch a new consumer advertising campaign that emphasizes the importance of doctor-led treatment with Invisalign clear aligners while also differentiating our brand. On the professional marketing side, we recently launched 2 dedicated professional Invisalign brand campaigns that feature orthodontists and GP dentists. As the "ortho as hero" campaign focuses on Invisalign orthodontists as clinical leaders and the heroes of transformative, life-changing smiles, especially for teen and younger patients. The campaign showcases modern orthodontic practices that leverage digital approaches to treatment and are warm and inviting. The "go beyond" campaign is designed to celebrate dentists who go above and beyond every day to serve their patients. It also demonstrates the relevance of tooth movement to general dentists and the importance of integrating Invisalign with comprehensive dentistry. This was launched in North America and is now being rolled out in EMEA and APAC regions.

31.     Also during the April 24th Conference Call, Defendant Morici discussed demand for the Company's products and the resultant outlook for the second quarter, stating in pertinent part as follows:

With that, let's turn to our Q2 outlook and the factors that inform our view, starting with the demand outlook. For international, we expect Q2 volumes to be up sequentially, reflecting seasonally stronger periods for both EMEA and APAC

regions. . . .  With this as a backdrop, we expect the second quarter to shape up as follows. Invisalign case volume is expected to be in the range of 380,000 to 385,000 cases, up approximately 26% to 27% year-over-year.  We expect Q2 revenues to be in the range of $590 million to $600 million, up approximately 20% to 22% year-over-year.

32.     The statements referenced above in ¶¶28-31 were materially false and misleading because they failed to disclose the following material adverse facts that were known to Defendants or recklessly disregarded by them:

(a)     that Align was then experiencing a significant decline in demand for its products in the important Chinese market;

(b)     that Chinese consumer sentiment towards the Company was deteriorating; and

(c)     that, as a result of the foregoing, Defendants' positive statements about Align and its businesses were lacking in a reasonable basis.

33.     On May 2, 2019, Align filed its quarterly report on Form 10-Q with the SEC.  This quarterly report included discussion of the international growth in Invisalign sales and demand, including specific discussion of the APAC market, stating in pertinent part as follows:

*International Invisalign Growth*.  We continue to focus our efforts towards increasing Invisalign clear aligner adoption by dental professionals in the EMEA and APAC markets.  ***On a year-over-year basis, our International Invisalign volume increased 38.5% driven primarily by increased adoption as well as expansion of our customer base in both the EMEA and APAC regions.  We continue to see growth from our international orthodontists and general practitioner ("GP") customers and are seeing more positive traction in the GP channel as we continue to segment our sales and marketing resources and programs specifically around each customer channel***.  In addition, we believe that continuous product introductions and feature improvements, such as Invisalign treatment with mandibular advancement, provide our customers with continued confidence in treating complex cases as well as teen-aged patients with Invisalign clear aligners. ***In 2019, we are continuing to expand in our existing markets through targeted investments in sales coverage and professional marketing and education programs, along with consumer marketing in select country markets.  We expect International revenues to continue to grow at a faster rate than the Americas for the foreseeable future due to our continued investment in international market expansion, the size of the market opportunities, and our relatively low market penetration of these regions***.

- 10 -

34.     The statement above was materially false and misleading because it omitted any discussion of the declining demand for Invisalign products in China.  Defendants could not truthfully include discussion of the "expansion of our customer base" in the APAC region without disclosing that demand in the Chinese market – the most important component of the APAC region – was deteriorating.  Similarly, Defendants could not state that revenues from international operations would "continue to grow at a faster rate than in the Americas for the foreseeable future" without also disclosing that the Company's single largest market outside the United States was experiencing a downturn in consumer sentiment toward Invisalign products.

35.     Beginning in mid-May 2019, Defendants Hogan and Morici attended a series of healthcare industry conferences hosted by the securities research divisions of various financial institutions.  At these conferences – in which the Individual Defendants gave detailed interviews to securities analysts – Defendants Hogan and Morici made numerous materially false and misleading statements about the strength of the Company's business in China, even though the second quarter was already ***more than half over*** and they necessarily knew or recklessly disregarded the true facts concerning weakening demand for Invisalign products in China.

36.     On May 14, 2019, Defendant Morici attended the Bank of America Merrill Lynch Health Care Conference, where he participated in an interview with a securities analyst.  Defendant Morici was asked about the Company's new "China manufacturing facility getting up to ramp. . . . [C]ould you give us an update on that?  Any other moving pieces as we think through 2Q, 3Q, 4Q?"  Defendant Morici responded:

> ***You mentioned China, and that gets a lot of attention.  And rightly so, it's a huge market opportunity for us***.  We've invested in our treatment planning there, and we've invested in training facilities.  We have an order acquisition, and then most recently, put in manufacturing.  That's one where – we've been for so long in Mexico producing well over 400,000 aligners a day.  There's a massive efficiency that we have in that operation being able to transfer that technology to a place in

China.  We know what to do.  It just takes scale.  You just have to utilize that equipment more and more.  ***We saw the start-up effects of it in Q4, really December, and then in Q1, we had more and more operations and more and more utilization there, and we saw some benefit there from a cost standpoint***.  And that shows up.

37.     At the same conference, Defendant Morici also minimized the impact of competition on the Company's business in China, stating that "I should mention though that we've seen competition, whether it's in China or U.S. or other places, we've been competing against many of these companies that I mentioned for a number of years and still been able to grow as we have."

38.     On May 29, 2019, Defendant Morici attended the Stifel Dental & Veterinary Conference in New York City, where he gave an interview to a securities analyst.  Asked to talk about "what you're seeing specific to APAC," Defendant Morici stated in pertinent part as follows:

> ***Well we see tremendous growth in APAC, in China, in particular***.  We made a lot of investments in China as you know a couple of years ago, went into treatment planning, having that treatment planning in China for the first time in the first quarter.  We've been able to treat 100% of the cases within China.  So there's some learning and development that has to go on within China to be able to do that and be able to have the experience to get those cases through.  We just put in another – announced another – a training facility in Shanghai in China.

Defendant Morici continued:

> That[ training facility has] come online now.  So we have a new training there in Shanghai in addition to Chengdu and that's to meet the demands of our doctors that they want to be able to be trained.  They want to be able to come with cases in hand to be able to grow their practices.  So we're seeing tremendous growth.  Timing of quarters, I know you get into whether we train a lot of doctors or we didn't or treatment planning or not, ***but we are very bullish on our growth internationally and in particular, APAC***.  So we look at that as over the long term.  It's an area that we've invested in, and we expect to win.

39.     Asked whether, "for the foreseeable future, you still see China being fastest growth, highest ASP," [2] and whether that would "remain in place for the next couple of years," Defendant Morici responded in pertinent part as follows:

---

[2]     "ASP" refers to "average selling price."

- 12 -

*The dynamics in China are really good for* us.  It is higher ASP.  They start with a higher list price.  They have very complicated cases, comprehensive cases, and we've invested from a treatment planning to be in country, speak the same language, reduce the cycle time between having iTero in China.  We introduced that in second quarter of last year.  We went from almost no cases sent digitally to almost 50% of the cases sent digitally within China.  So the appetite for growth and new technology adoption in China has been great for us.  And as you mentioned, the economics work well for us.

40.     Defendant Morici also emphasized the Company's new manufacturing facility in China and its role in satisfying growing demand for Invisalign in that market – without disclosing the decline in demand for Invisalign in that same market.  As Defendant Morici stated in pertinent part as follows:

Well, when you're – as you mentioned Mexico, we've been manufacturing there for a number of years.  Have that efficiency, have that process down.  But to ship for Mexico to China, you're air shipping something and having to go through the logistics and not only in costs related to that but just the time that it takes, the added time.  *Whereas now, manufacturing in China, like you said, there is a ramp up*.  We just started manufacturing in China in December and you go from a small amount of volume to start to utilize that facility more and more.  We saw some benefits in Q1 as we start to put more throughput into that facility and increase the utilization.  We'll continue to see improvement as we go through this year in terms of reducing manufacturing cost. It does reduce the freight cost because it's in China, much closer.  It also reduces the cycle time for product to be shipped within China.  It also has a – it's now made in China and being able to have access to some accounts, some hospitals, some groups that want or really mandate that, that things get bought or sourced within China.

41.     On June 5, 2019, Defendant Morici participated in the Jeffries Healthcare Conference in New York City, where he was interviewed by an analyst.  With regard to China, Defendant Morici was asked to "describe what the competitive landscape there looks like," to which he responded in pertinent part as follows:

I mean when you think about China growth, if I was on the stage a few years ago, China wouldn't be in our top 5 from a market standpoint, and it's *solidly #2 right now behind the U.S. Great economics there from the standpoint that massive population, growing middle class, we have higher list prices, higher ASPs in China, very complicated cases, a lot of orthodontists that we sell to, selling more and more to hospitals*.  So we recognized a few years ago that we wanted to have treatment planning.  Currently majority of our treatment planning is done in Costa

- 13 -

Rica.  The first place that we went outside of Costa Rica was China and that was about 2 years ago, we've been able to have treatment planning.  ***So those are technicians in China to be able to work with our customers to be able to provide the quality treatment that they expect***.  It saves time from a translation standpoint, you're in the current language, same time zone.  So the timing has really improved.  Just this last quarter, we've now been able to go from no cases to the treatment plan to 100% of our cases in China to be able to be done by technicians in China.

We've ramped up our training.  We have a training facility that's in Chengdu, right where our treatment planning is.  We opened up another training in Shanghai, close to our sales office to be able to work with doctors to get them to understand our product, understand the processes, make them work with their technicians and others locally so they can understand and take on more and more complicated cases.

And then most recently, we put manufacturing into China and we started manufacturing in December, started ramping up, continued to ramp up through the first quarter.  That'll continue through this year and into next and with the goal that we'll have China and Greater China manufacturing locally in China and then eventually perhaps Asia Pacific manufacturing.  So it's a key strategy for us.  ***It's supplying and taking care of our second-biggest market, a market that's growing significantly for us*** and a key strategy that we have to go from the centralized understanding that we have to be able to design and manufacture products and be able to make that transition to be more local.

42.    Asked about the initial startup costs of the new facility in China, Defendant Morici highlighted the proximity of the plant to the Company's Chinese consumers, but did not disclose that, with less than a month before the end of the quarter, the Company's sales in China were in significant decline.  Defendant Morici stated in pertinent part as follows:

So we had – we went from no manufacturing to starting manufacturing in December. And so the case volume, it's very dependent on case volume.  When we think of the customized aligners that we make a day, typically we're 450,000-plus aligners a day. So unique aligners that are made, vast majority are done in Mexico and now we're ramping up within China.  It's all about the number of aligners that you can put through a facility to really get that higher utilization, be able to drive down your cost. So what we saw and we guided to this year is that we'd see an impact in the first quarter as we continue to ramp up and start to utilize that facility.  And we saw some effect in the first quarter, but as we look at the rest of this year, we expect our efficiency to improve and our productivity to improve within China and that should progress as you go quarter-by-quarter until you get into next year.  And then you're at a cost differential because there's still so much volume that comes through Mexico, ***but you do save in China from a freight standpoint.  You're closer to your customers, your freight is less and the time is less.  You're able to manufacture and get your product to your customers much faster.  So this is a part of our***

- 14 -

*globalization strategy to be close to customers, give them the products that they want when they want them*.

43.     On June 6, 2019, Defendant Hogan participated in the William Blair Growth Stock Conference, where he was interviewed by an analyst.  Defendant Hogan was asked specifically about China and "about the trade disputes that have been sort of percolating, has that impacted your business yet?  And where do you think it might?"  Defendant Hogan responded by emphasizing the Company's growth in consumer demand in China and downplaying any decline in consumer sentiment, stating in pertinent part as follows:

> Well, I can't comment on in-period obviously, but our first quarter data on China was good.  *We continue to grow there.  There is a lot of under-penetration there in the sense of what consumer demand is*.  We've worked pretty hard the last few years to move treatment planning.  We have treatment planning now in Chengdu and so it doesn't go to Costa Rica anymore.  *It's been a big hit with our Chinese customers*.  We moved manufacturing over, John, as you know too and that's ramping up.  We're in a rental facility now and we'll go full speed with our own facility there shortly.  *So I feel regardless of what the trade dispute is or whatever, we can represent ourselves as a Chinese company now and it's still that way*.  And so that doesn't mean we'll be completely insulated from that kind of an issue, but all of the tax pieces and everything else between the 2 partners, we can see ourselves steering away from a lot of that because we have our own endemic manufacturing.

44.     Near the end of the Company's second fiscal quarter, on June 11, 2019, Defendant Morici attended the Goldman Sachs Global Healthcare Conference, where he participated in an interview by an analyst.  He again emphasized the Company's proximity to Chinese consumers, without disclosing the declining interest in the Company's products taking place in China.  He stated in pertinent part as follows:

> I think when we look at our manufacturing, *we're always interested in providing better support to our customers, be closer to our customers and I think manufacturing in China, in our second largest market, demonstrates that*.  And like you said, we recently started manufacturing in China.

45.     Defendant Morici likewise stressed the Company's "growth" as a result of its new training facility in China and its proximity to the Chinese markets:

[Y]ou see us with having treatment or treatment planning, either in the region or in cases like in China, we just introduced a new training facility there in Shanghai. But being able to be closer to those doctors, get them the training that they need so that they can take on these more and more complicated cases, that drives higher utilization and that helps us grow that way.

46.     Defendant Morici also emphasized that the use of iTero scanners in China helped drive increasing volume of Invisalign sales – without also mentioning that demand for those sales was deteriorating – stating in pertinent part as follows:

China follows a similar practice as in the U.S. and so on, where having a scanner and having a scan will lend itself to more Invisalign volume.

And you're right. We've started with iTero in the second quarter of last year. We went from almost no scans, less than 5% to, as you mentioned, now in the mid-40s. Close to 50% of our – the workflow that we have through China is done with the scan upfront.

So very, very fast adoption. It's a reflection of just the appetite for change, driving new technology, really embracing the digital workflow end-to-end and not have to deal with the physical impressions and some of the effort that it takes to do that, having the scan right from the start, being able to drive their higher utilization with that scan.

And remember, in China, many – they are very complicated cases that sometimes need refinements and corrections and so on, and a scanner lends itself to that. You could get a very accurate scan to begin with. And then as changes need to be made, it's another scan to be able to provide whatever adjustments are needed to be able to give that treatment.

***But China is no different from the standpoint that when you have an iTero and you really include that as part of their digital workflow and ecosystem, that drives higher and higher amount[s] of Invisalign volume***.

47.     The statements identified above in ¶¶36-46 were materially false and misleading for the reasons stated in ¶32. In addition, in speaking affirmatively about the Company's business in China – including numerous specific statements concerning demand for the Company's products in that critical market – Defendants were obligated to do so completely and to disclose all information necessary to make their affirmative statements, in the context in which they were made, truthful, accurate, and not materially misleading. Defendants could not, consistent with the federal securities

- 16 -

laws, make repeated positive statements about growth and demand for the Company's products in China without also communicating to the marketplace the true facts concerning the deteriorating demand for and decline in consumer sentiment toward Invisalign products in China. Defendants' statements – including, *inter alia*, that China is "a huge market opportunity for us"; "we see tremendous growth in APAC, in China, in particular"; "we are very bullish on our growth internationally and in particular, APAC"; "[t]he dynamics in China are really good for us"; Invisalign has "been a big hit with our Chinese customers"; and iTero scanners "drive[] higher and higher amount[s] of Invisalign volume" – all required Defendants to disclose material true facts concerning the decline in demand for and consumer sentiment toward Invisalign products. Their failure to disclose this information rendered their statements identified above materially false and misleading.

48.     Then, on July 24, 2019, after the market closed, Align issued a press release announcing its financial results for the second quarter of 2019. In the earnings release and during a related earnings conference call, Defendants acknowledged the previously undisclosed deterioration of Align's business in China. Specifically, the Company announced:

> "In Q2, ***total Invisalign case shipments were lower than expected, primarily due to a softness in China related to a tougher consumer environment*** and slower growth in young adult case in North America. ***Given the uncertainty in China, our outlook for the third quarter reflects a more cautious view for growth in the Asia Pacific region***."

As a result, the Company also lowered its guidance for the full 2019 fiscal year, as follows:

> Based on the current growth rates in our business to date and our planned investments for the remainder of the year, we now anticipate 2019 total revenue growth rate to be at the low end of our long-term operating model target of 20% to 30%. We also expect Invisalign revenue and volume growth to be at the low end of our long-term operating model target.

49.     Analysts on the conference call were incredulous that the Company had not previously disclosed the deterioration of its business in China. As one analyst put it: "[N]ot to get

too granular in what transpired over the past 3, 4 months, but just coming back to the June quarter case volume . . . *you guys were at a lot of conferences through mid-June with the message that everything seemed okay*." In response, Defendant Hogan **admitted knowing** about the Company's declining China business during the Class Period stating in pertinent part as follows:

> [L]ike you said, not to be over granular though, *I think China by far was one where – when you got to June and all, it was more difficult than what we had anticipated*. Our China team is terrific too, so *you do count on these guys to be able to deliver toward the end of the quarter*. And we see that time and time again. It just didn't materialize, and that consumer sentiment piece became more and more visible to us as we got through the quarter in that way.

In other words, by their own admission, Defendants knew that demand in China was declining significantly during the Class Period, but continued to make materially misleading positive statements about the Company's business in China.

50.     On the following day, July 25, 2019, Align's stock price plunged as a result of this news. From a market closing price of $275.16 per share on July 24, 2019, the Company's revelations concerning its deteriorating business in China caused the stock to drop $74.26 per share to a closing price of $200.90 per share on July 25, 2019.

51.     Later on July 25, 2019, CNBC published an article about the sharp decline in the price of Align's stock entitled "Invisalign maker warns of slowdown in China, shares plummet 27%." The article described the significant decline in the price of Align stock "on the back of a dire warning about China and weaker-than-expected results." The article quoted Defendant Hogan explaining that, "'[g]iven the uncertainty in China, our outlook for the third quarter reflects a more cautious view for growth in the Asia Pacific region.'" That evening, Defendant Hogan appeared on CNBC's *Mad Money* for an interview. In that interview, Defendant Hogan explained that "we were expecting about 70% growth out of China and we achieved about 20%-30%." "It's not a

competitive issue," Defendant Hogan continued, "it's not an operational issue at all, it's just basically a consumer backlash right now" leading to what "was broadly a China miss."

## LOSS CAUSATION/ECONOMIC LOSS

52.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Align common stock and operated as a fraud or deceit on purchasers of Align common stock.  When the truth was revealed, the value of Align common stock declined precipitously, as the prior artificial inflation no longer propped up the price.  The decline in the price of Align common stock was the direct result of the nature and extent of Defendants' fraud being revealed to investors and the market.  The timing and magnitude of the price decline negate any inference that the losses suffered by plaintiff and other members of the Class (as defined below) were caused by changed market conditions, macroeconomic or industry factors, or other facts unrelated to Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by plaintiff and other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Align common stock and the subsequent significant decline in the value of Align common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

53.     Defendants' materially false and misleading statements and omissions alleged herein directly and proximately caused the damages suffered by plaintiff and the other Class members. Throughout the Class Period, Defendants issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing the price of Align common stock to be artificially inflated.  Plaintiff and other Class members purchased Align common stock at those artificially inflated prices, causing them to suffer damage as complained of herein when the relevant truth was revealed.

- 19 -

**NO SAFE HARBOR**

54.     To the extent that "Safe Harbor" warnings accompanied Defendants' purportedly forward-looking statements ("FLS") issued during the Class Period, such warnings were ineffective to shield those statements from liability.  Because most of the false and misleading statements related to existing facts or conditions, the Safe Harbor has no applicability.  To the extent that known trends should have been included in the Company's financial reports prepared in accordance with GAAP, they are excluded from the protection of the statutory Safe Harbor.  15 U.S.C. §78u-5(b)(2)(A).

55.     The Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer and/or director of Align who knew that the FLS was false.  In addition, the FLS were contradicted by existing, undisclosed material facts that were required to be disclosed so that the FLS would not be misleading.  Finally, most of the purported "Safe Harbor" warnings were themselves misleading because they warned of "risks" that had already materialized or failed to provide any meaningful disclosures of the relevant risks.

**APPLICABILITY OF PRESUMPTION OF RELIANCE:**
**FRAUD-ON-THE-MARKET DOCTRINE**

56.     At all relevant times, the market for Align common stock was efficient for the following reasons, among others:

(a)     Align common stock met the requirements for listing and was listed and actively traded on the NASDAQ exchange, a highly efficient and automated market;

(b)     the Company has over 72 million shares of common stock in its public float on the NASDAQ, demonstrating a very active and broad market for Align common stock;

(c)     as a regulated issuer, Align filed periodic public reports with the SEC;

(d)     Align regularly communicated with public investors via established market communication mechanisms, including regular discussions with securities analysts covering the Company, as well as the regular dissemination of press releases on major newswire services, the Internet, and other wide-ranging public disclosures; and

(e)     unexpected material news about Align was rapidly reflected in and incorporated into the price of Align common stock during the Class Period.

57.     As a result of the foregoing, the market for Align common stock promptly digested current information regarding Align from publicly available sources and reflected such information in the price of Align common stock.  Under these circumstances, all purchasers of Align common stock during the Class Period suffered similar injury through their purchase of Align common stock at artificially inflated prices and a presumption of reliance applies.

## CLASS ACTION ALLEGATIONS

58.     This is a class action on behalf of purchasers of Align common stock during the Class Period who were damaged thereby (the "Class").  Excluded from the Class are Defendants and their families, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

59.     Common questions of law and fact predominate and include: (a) whether Defendants violated the 1934 Act; (b) whether defendants omitted and/or misrepresented material facts; (c) whether Defendants knew or recklessly disregarded that their statements were false; (d) whether the price of Align common stock was artificially inflated during the Class Period; and (e) the extent of and appropriate measure of damages.

60.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Align common stock was actively traded on the

NASDAQ exchange.  Upon information and belief, these shares are held by thousands of individuals and entities located throughout the country and the world.

61.      Plaintiff's claims are typical of those of the Class.  Prosecution of individual actions would create a risk of inconsistent adjudications.  Plaintiff will adequately protect the interests of the Class.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

### COUNT I

**For Violation of §10(b) of the 1934 Act and Rule 10b-5**
**Against All Defendants**

62.      Plaintiff hereby incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

63.      During the Class Period, Defendant Align and the Individual Defendants disseminated or approved the false statements specified herein, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

64.      Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)      employed devices, schemes, and artifices to defraud;

(b)      made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)      engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Align common stock during the Class Period.

65.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Align common stock and suffered losses when the relevant truth was disclosed.  Plaintiff and the Class would not have purchased Align common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by Defendants' misleading statements.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against the Individual Defendants

66.    Plaintiff hereby incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

67.    The Individual Defendants acted as controlling persons of Align within the meaning of §20(a) of the 1934 Act.  By reason of their positions with the Company, the Individual Defendants had the power and authority to, and did, cause Align to engage in the wrongful conduct complained of herein.  By reason of such conduct, the Individual Defendants were culpable participants in the fraudulent scheme alleged herein and are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment as follows:

A.    Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

- 23 -

C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this

action, including counsel fees and expert fees; and

D.      Awarding such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

DATED:  March 2, 2020                              ROBBINS GELLER RUDMAN
                                                     & DOWD LLP
                                                   SAMUEL H. RUDMAN


                                                   _____
                                                       SAMUEL H. RUDMAN

                                                   58 South Service Road, Suite 200
                                                   Melville, NY  11747
                                                   Telephone:  631/367-7100
                                                   631/367-1173 (fax)
                                                   srudman@rgrdlaw.com

                                                   ROBBINS GELLER RUDMAN
                                                     & DOWD LLP
                                                   BRIAN E. COCHRAN
                                                   200 South Wacker Drive, 31st Floor
                                                   Chicago, IL 60606
                                                   Telephone:  312/674-4674
                                                   312/674-4676 (fax)
                                                   bcochran@rgrdlaw.com

                                                   ROBBINS GELLER RUDMAN
                                                     & DOWD LLP
                                                   NOAM MANDEL
                                                   125 Park Avenue, 25th Floor
                                                   New York, NY  10017
                                                   Telephone:  212/791-0567
                                                   noam@rgrdlaw.com

VANOVERBEKE, MICHAUD
  & TIMMONY, P.C.
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)
tmichaud@vmtlaw.com

*Attorneys for Plaintiff*

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

CITY   OF   ROSEVILLE   EMPLOYEES'   RETIREMENT   SYSTEM
("Plaintiff") declares:

1.      Plaintiff has reviewed a complaint and authorized its filing.

2.      Plaintiff did not acquire the security that is the subject of this action at
the direction of plaintiff's counsel or in order to participate in this private action or
any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the
class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period
in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

See attached Schedule A.

5.      Plaintiff has not sought to serve or served as a representative party in
a class action that was filed under the federal securities laws within the three-year
period prior to the date of this Certification except as detailed below:

*In re Apple Inc. Sec. Litig.*, No. 4:19-cv-02033 (N.D. Cal.)

6.      Plaintiff will not accept any payment for serving as a representative
party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

ALIGN

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 24th day of February, 2020.

CITY OF ROSEVILLE EMPLOYEES'
RETIREMENT SYSTEM

By: _____
ROBERT R. TAYLOR

Its: Chairman _____

- 2 -

ALIGN

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Stock**

| Date<br>Acquired | Amount of<br>Shares Acquired | Price |
|:---:|:---:|:---:|
| 04/25/2019 | 62 | $296.86 |
| 04/26/2019 | 90 | $314.69 |
| 04/29/2019 | 66 | $318.12 |
| 04/30/2019 | 16 | $319.60 |
| 05/01/2019 | 66 | $324.73 |
| 06/03/2019 | 123 | $282.96 |
| 06/04/2019 | 70 | $294.51 |
| 06/05/2019 | 31 | $298.93 |

Prices listed are rounded to two decimal places.