1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**BLEICHMAR FONTI & AULD LLP**
Peter E. Borkon (Bar No. 212596)
pborkon@bfalaw.com
555 12th Street, Suite 1600
Oakland, California 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020

**BLEICHMAR FONTI & AULD LLP**
Javier Bleichmar (*pro hac vice*)
jbleichmar@bfalaw.com
7 Times Square, 27th Floor
New York, New York 10036
Tel: (212) 789-1340
Fax: (212) 205-3960

(*additional counsel on signature page*)

*Counsel for Lead Plaintiff*
*Macomb County Employees' Retirement System*
*and Lead Counsel for the Putative Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| *In re Align Technology, Inc. Securities Litigation* | Case No. 3:20-CV-02897-MMC <br><br> <u>CLASS ACTION</u> <br><br> **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> **JURY TRIAL DEMANDED** |

**TABLE OF CONTENTS**

I.     NATURE OF THE ACTION ...................................................................................... 1

II.    JURISDICTION AND VENUE ................................................................................. 5

III.   PARTIES ..................................................................................................................... 6

    A.   Lead Plaintiff ......................................................................................................... 6

    B.   Defendants ............................................................................................................. 7

IV.    SUBSTANTIVE ALLEGATIONS ........................................................................... 8

    A.   Relevant Background ........................................................................................... 8

        1.   Align's Business ............................................................................................... 8

        2.   Prior to the Class Period, Align's Invisalign Growth Began to Slow in the U.S. While China Growth Accelerated .......................................................... 12

        3.   Growth Slowed Substantially in 3Q2018 in North America ................................ 15

        4.   China Becomes Critical to the Company and Wall Street Analysts .................... 16

    B.   At the Beginning of the Class Period Defendants Knew, or Were Deliberately Reckless in Not Knowing, that Growth in China Had Materially Slowed ................. 23

        1.   Defendants Tracked Invisalign Sales and Were Routinely Provided Negative Data Showing Growth Had Materially Declined ............................................... 23

        2.   Hogan and Morici Admitted that the Growth Decline in China Was Apparent in June 2019 ............................................................................................................ 31

    C.   Actionable False and Misleading Statements and Omissions ......................................... 31

        1.   False and Misleading Statements and Omissions in the April 2019 Earnings Call and Form 10-Q Filed in May 2019 ................................................................. 31

        2.   Wall Street Analysts Were Deceived by Defendants' Statements ....................... 33

        3.   False and Misleading Statements and Omissions at the Bank of America Merrill Lynch Health Care Conference on May 14, 2019 .................................... 34

        4.   False and Misleading Statements and Omissions at the Stifel Dental & Veterinary Conference on May 29, 2019 .............................................................. 35

        5.   False and Misleading Statements and Omissions at the Jefferies Healthcare Conference on June 5, 2019 .................................................................................. 38

6. False and Misleading Statements and Omissions at the Goldman Sachs Global Healthcare Conference on June 11, 2019 ............................................................ 39

D. Align Discloses On July 24, 2019 That Growth Plummeted in China ......................... 40

E. Summary of Scienter Allegations That Support A Strong Inference That Defendants Knew, or With Deliberate Recklessness Disregarded, That Growth in China Had Materially Slowed .......................................................................................................... 43

1. According to Former Employees, By the Beginning of the Class Period Defendants Knew, or Were Deliberately Reckless in Not Knowing, that Growth in China Had Materially Slowed ............................................................... 43

2. Hogan and Morici Provided Knowledgeable, Detailed and Unequivocally Positive Responses to Analyst Questions About Growth in China ..................... 43

3. China Constituted Core Operations of the Company ............................................ 45

4. The Decline in Growth in China Was Massive ...................................................... 46

5. The Temporal Proximity Between the False Statements and the Material Decline in Growth Was Very Close ........................................................................ 46

6. Align Executives Reaped Millions from Insider Sales .......................................... 46

7. Corporate Scienter .................................................................................................. 48

V. LOSS CAUSATION ....................................................................................................... 49

VI. INAPPLICABILITY OF STATUTORY SAFE HARBOR OR BESPEAKS CAUTION DOCTRINE ..................................................................................................................... 50

VII. PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET DOCTRINE ..... 51

VIII. CLASS ACTION ALLEGATIONS ................................................................................ 51

IX. CLAIMS FOR RELIEF .................................................................................................. 53

X. JURY TRIAL DEMAND ................................................................................................ 56

XI. PRAYER FOR RELIEF .................................................................................................. 56

Court-appointed Lead Plaintiff Macomb County Employees' Retirement System ("Lead Plaintiff") brings this action on behalf of itself and all those who purchased or otherwise acquired Align common stock during the period of April 25, 2019 and July 24, 2019 (the "Class Period"), both inclusive, and were damaged thereby (the "Class").

Lead Plaintiff alleges claims under Sections 10(b), 20(a), and 20A of the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq., (the "Exchange Act") against:

(1)     Align Technology, Inc. ("Align" or the "Company");

(2)     Joseph M. Hogan, Align's President and CEO ("Hogan");

(3)     John F. Morici, Align's CFO and Senior Vice President, Global Finance ("Morici"); and

(4)     Julie Tay, Align's Senior Vice President and Managing Director, Asia Pacific ("Tay," together with Morici and Hogan, the "Individual Defendants," and with Align, "Defendants").

The allegations are based upon personal knowledge as to Lead Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Lead Counsel. Lead Counsel's investigation included, among other things, a review and analysis of Align's SEC filings, transcripts of Align's public conference calls, press releases issued by Align, news and media reports concerning the Company, research reports issued by financial analysts, interviews with former employees of Align, and other publicly available information. Lead Plaintiff believes that, after a reasonable opportunity for discovery, substantial additional evidentiary support will be available for trial that further supports the allegations in this Complaint.

## I.     NATURE OF THE ACTION

1.     This case arises from Defendants' misrepresentations about Align's purportedly "tremendous" sales growth of the Company's most important product ("Invisalign" braces) in one of Align's most important markets (China). Defendants repeatedly told investors during the Class Period that the Company's Invisalign sales growth in China remained strong at levels of approximately 70% annual growth as had been achieved in the prior two years. But the truth was

1   that Defendants knew, or were deliberately reckless in disregarding, that Align's sales growth in

2   China had materially decreased to a range of 20%-30%.

3       2.     Align is a medical device company that manufactures braces to treat misaligned

4   teeth.  The Company generates roughly 80% of its revenue from selling a type of braces branded

5   with the name "Invisalign."  As opposed to traditional wire braces, Invisalign is made of clear,

6   flexible plastic, and is removable.  Align derived the remaining 20% of its revenue from a

7   mandibular scanner called "iTero."  iTero allowed dentists to take extremely precise digital images

8   of patients' teeth which were then immediately sent electronically to Align to manufacture the

9   plastic braces.  The information dentists sent to Align from iTero provided the Company with

10   specific, granular information regarding its sales pipeline; information that was transmitted and

11   available to Defendants during the Class Period.

12       3.     Align started selling Invisalign in the U.S. in 1999.  For roughly two decades, the

13   Company was the only major producer of plastic, removable braces, causing its sales in the U.S.

14   to soar.  By 2017, however, dozens of the Company's key patents began to expire, paving the way

15   for new, low-cost producers to enter the U.S. market and compete directly with Align.  This

16   competition significantly dented Align's growth in the U.S.

17       4.     In contrast to the U.S.'s waning growth, the Company's growth in International

18   markets, particularly China, continued to surge.  China was Align's fastest growing market, and

19   its second-largest in terms of revenue only behind the U.S.  The number of Invisalign braces Align

20   shipped in China increased 88% on average, year-over-year, between 2013 and 2017.  In 2018,

21   that growth increased to 91%.  Tay (the head of the Asia Pacific region, "APAC") specifically

22   touted on March 1, 2019 that "China is our second largest market, and ***our fastest growing country***

23   ***market with approximately 70 percent annual growth rate***."

24       5.     In light of this exponential growth, China became a primary focus of Align and

25   Wall Street analysts immediately prior to the beginning of the Class Period on April 25, 2019.  For

26   instance, a report by UBS on February 14, 2019 increased UBS' price target on Align stock from

27   $230 to $275 per share largely because of growth in China, stating: "we believe that [Align's]

28   growth is going to become increasingly dependent on international revenues, ***particularly in***

*China*." Align's CEO, Hogan, similarly recognized that Align's "record Invisalign volume" was "*led by China*" on the Company's earnings conference call for 4Q2018 held on January 29, 2019.

6.    Well aware of Wall Street's focus on China, Defendants falsely told investors repeatedly throughout the Class Period that Align was experiencing "tremendous growth" there, that the Company was "driv[ing] higher and higher amount of Invisalign volume," that Align has "still been able to grow as we have" in China, that China was a "great growth market" for Align and was "a market that's growing significantly for us."  Investors and Wall Street analysts clearly and reasonably understood these statements to denote growth rates in the range of 70% for China, consistent with the Company's growth there in the prior two years and Tay's March 1, 2019 statement confirming that the Company had an "approximately 70 percent annual growth rate." (¶4).

7.    In truth, the Company's growth in China had significantly declined from 70% by the beginning of the Class Period, and Defendants knew or acted with deliberate recklessness in disregarding those facts.  Numerous Former Employees ("FE") said that the Company had state-of-the-art systems that tracked sales up to the minute and that the Individual Defendants had access to those systems and received reports containing that information.  For example, FE 1 (former Align Global Analytics Analyst from June 2019 until after the end of the Class Period) explained how FE 1 personally prepared global, consolidated reports for Morici and Hogan, which they received monthly and quarterly.  The reports allowed Morici and Hogan to see revenue and sales generated from sales of Invisalign for China, on a weekly basis, and compare sales trends over time.

8.    The reports also showed the lag time between when a dentist first scanned a customer using iTero to be fitted for Invisalign and when that customer purchased the product. Importantly, according to FE 1, while a two-week lag time was typical, 15% of Align's scans in China had already aged 90 days as of April 1, 2019.  Years of prior experience had shown that such a long lag time meant that there was no chance that they would result in a sale.  And according to FE 1, this was evidence that, as of April 1, 2019, Align's growth in China had materially slowed based on the lag time, and that data was available to executives to monitor.

9.      Likewise, FE 2 (Senior Project Manager, IT Infrastructure from prior to the beginning of the Class Period until after the end of the Class Period) stated that Hogan, Morici and Tay knew that growth had nosedived in China during 2Q2019.  According to FE 2, "It was not like at the end of the quarter, the executives suddenly" had access to or looked at the data and said, "Oh my gosh, that is so crazy."  To the contrary, FE 2 explained that Defendants closely tracked and had access to all relevant Invisalign sales data in China, at all times during the Class Period. Indeed, FE 2 explained that Align used several systems to track Invisalign sales in China, including a SAP information system, Manufacturing Execution System, Salesforce, and a massive data warehouse that communicated with each of these various systems and allowed the executives to track the various sales metrics.  FE 2 stated that "everyone knew how many orders there were. *The only way they did not know is if they did not want to know.*"  Executives knew this information "down to the day, *down to the minute.*"  FE 2 specifically stated that Tay could tell someone "in two seconds" how many orders were submitted in China on any given day and what the status of those orders were.

10.      Likewise, FE 3 (Manager of Advanced Analytics for Align from prior to the Class Period until after the end of the Class Period) also described how Hogan, Morici (CFO), and Tay had access to Invisalign sales data for China, that Align's systems (known as "dashboards") *automatically generated reports daily for all of Align's territories*, and that APAC's upper management had monthly meetings, during which sales results were discussed.

11.      Consistent with the accounts of these former Align employees, Hogan and Morici *admitted* on July 24, 2019 that they knew of Align's declining growth in China at least by *"June [2019]."*  This is despite the fact that Morici had told investors *in May 2019* that the Company has "still been able to grow as we have" in China, and *in June 2019* that iTero was driving "higher and higher amount[s] of Invisalign volume" in China, and was "growing significantly" there. Hogan's and Morici's admission regarding how Align's growth in China had massively declined by June is consistent with the information in the reports sent to Defendants, but remarkably inconsistent with Hogan's and Morici's public statements to investors during the Class Period.

12.     Less than two months after Morici acclaimed the Company's "tremendous growth" in China, Align revealed on July 24, 2019 that quarterly, year-over-year growth had plummeted, and the size of the drop was astounding.  While growth in China had oscillated in 2017, 2018, and 1Q2019 between 70% and 100%, in 2Q2019 it fell off the cliff to "about 20-30%" – a record low. Hogan blamed a consumer backlash and "tougher consumer environment" for the plummeting sales on the 2Q2019 earning call on July 24, 2019.

13.     Analysts were shocked that the Company had not previously disclosed the material decline in China given that Hogan and Morici had looked at these same analysts in the eye in May and June and trumpeted growth there.  Steven Valiquette from Barclays stated on the 2Q2019 earnings call, "[s]o not to get too granular in what transpired over the past three, four months, but just coming back to the June quarter and case volumes for a moment . . . *you guys were at a lot of conferences through mid-June with the message that everything seemed okay*."  UBS then issued a report on July 25, 2019 that questioned Align's "visibility into their business given they . . . met with investors into June with what was perceived as a positive message."  And Piper Jaffray reluctantly stuck to its "Overweight" weighing on Align stock on July 24, 2019, noting that there is "no point defusing a bomb after it's gone off" after the "slowdown in China."

14.     The news of the declining growth in China caused the price of Align stock to decline 27%, from $275.16 per share on July 24, 2019 to $200.90 per share on July 25, 2019, wiping out about $5.4 billion in shareholder value.  The 27% decline represents Align's largest post-earnings decline in at least a decade.

## II.    JURISDICTION AND VENUE

15.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa).  The claims asserted herein arise under Sections 10(b), 20(a), and 20A of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a), and 78t-1), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5 (17 C.F.R. §240.10b-5).   In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. § 1331.

16.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of a national securities exchange.

17.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa).  In addition, venue is proper pursuant to 28 U.S.C. § 1391.  Many of the acts and transactions giving rise to the violations of law complained of herein occurred in this District.  In addition, Align maintained its corporate headquarters and principal executive offices in this District throughout the Class Period, at which Hogan and Morici were based.

18.     Likewise, as a senior executive officer of Align, Tay routinely traveled to the U.S., including to the Company's corporate headquarters in this District and to the Company's Americas headquarters in Morrisville, North Carolina.  Tay, together with Hogan and Morici, were members of Align's Executive Management Committee ("EMC") and attended monthly meetings in this District and in Morrisville, North Carolina to discuss the Company's financial data, current performance, and forecasted numbers, including those pertaining to China.  Hogan, Morici, and Tay availed themselves of the laws of the United States through their presence and acts in this District, including the preparation and dissemination of materially false and misleading statements and omissions directed to U.S. investors, their management and control over Align, its policies and its decision making process, as well as their active involvement and oversight over the Company's day-to-day operations and management as senior executive officers of the Company.

### III.     PARTIES

**A.     Lead Plaintiff**

19.     Court-appointed Lead Plaintiff, Macomb County Employees' Retirement System ("MCERS"), is a single employer defined benefit pension plan based in Macomb County, Michigan that provides pension and ancillary benefit services to substantially all of the County's employees.  As of December 31, 2018, Lead Plaintiff managed roughly $1 billion in total assets on behalf of approximately 5,400 active and retired Macomb County employees and their

beneficiaries.  As set forth in the certification attached as Exhibit A to this Amended Complaint, MCERS purchased Align common stock on the NASDAQ Exchange ("NASDAQ") during the Class Period and was damaged by Defendants' violations of the federal securities laws alleged herein.

**B.    Defendants**

20.    Defendant Align is a global medical device company engaged in the design, manufacture and marketing of Invisalign clear aligners and iTero intraoral scanners and services for orthodontics, and restorative and aesthetic dentistry.  The Company is incorporated in Delaware with its principal executive offices located at 2820 Orchard Parkway, San Jose, California 95134. Align also has an office located in Morrisville, North Carolina, which serves as its Americas headquarters.  Align's common stock trades on NASDAQ under the ticker symbol "ALGN."  As of July 26, 2019, Align had nearly 80 million shares of common stock outstanding.

21.    Defendant Hogan has served as Align's President and Chief Executive Officer, as well as a member of the Company's Board of Directors, since June 2015.  In this role, Hogan frequently spoke on behalf of Align during various earnings calls, conferences and meetings during the Class Period.  Hogan made false and misleading statements during the Class Period as alleged specifically below.  During his tenure at Align, Hogan had the power and authority to, and in fact did, approve and control the contents of his own statements and the statements in the Company's SEC filings alleged herein to be false and misleading.  Given his senior executive position at Align and involvement in its day-to-day operations and key strategic decisions, as well as his access to material non-public information regarding the Company, particularly Align's business in China, Hogan acted as a controlling person of Align and influenced and controlled its management, policies, and decision-making process.

22.    Defendant Morici has served as Align's Chief Financial Officer and Senior Vice President, Global Finance, since November 2016.  In this role, Morici frequently spoke on behalf of Align during various earnings calls, conferences and meetings during the Class Period.  Morici made false and misleading statements during the Class Period as alleged specifically below.

During his tenure at Align, Morici had the power and authority to, and in fact did, approve and control the contents of his own statements and the statements in the Company's SEC filings alleged herein to be false and misleading.  Given his senior executive position at Align and involvement in its day-to-day operations and key strategic decisions, as well as his access to material non-public information regarding the Company, particularly Align's business in China, Morici acted as a controlling person of Align and influenced and controlled its management, policies, and decision-making process.

23.     Defendant Tay is an executive officer of the Company and has served as Align's Vice President and Managing Director, Asia Pacific between March 2013 and February 2018, and as Senior Vice President and Managing Director, Asia Pacific since February 2018.  Given her senior executive position at Align and involvement in its day-to-day operations and key strategic decisions, and access to material non-public information regarding the Company, particularly Align's business in China, Tay acted as a controlling person of Align and influenced and controlled its management, policies, and decision-making process.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Relevant Background

#### 1.     Align's Business

24.     Align designs, manufactures, and markets devices to treat misaligned teeth, otherwise known as malocclusion.  Malocclusion is one of the most prevalent clinical dental conditions, affecting billions of people, or approximately 60%-75% of the global population. Every year, roughly 12 million people in major developed countries are treated by orthodontists worldwide, and approximately 75% (8.4 million) could benefit from Align's products.

25.     The Company sells its products directly to customers, which are orthodontists and general practitioner dentists ("GPs"), as well as restorative and aesthetic dentists, including prosthodontists, periodontists, and oral surgeons in four geographic markets: (i) North America, (ii) Latin America, (iii) Asia Pacific ("APAC"), and (iv) Europe, the Middle East, and Africa ("EMEA").

26.     Operationally, Align has two segments: (1) Clear Aligner (which includes Invisalign) and (2) Scanners and Services (which includes iTero).  Invisalign is a type of dental device commonly referred to as braces.  As opposed to traditional wire braces, Invisalign is made of clear, flexible plastic, and is removable.  Invisalign accounted for over 80% of the Company's net revenues in 2018 and 2019.  An example of an Invisalign aligner is depicted below.



27.     The remainder of the Company's revenue (roughly 20%) is accounted for by iTero and its ancillary products.  iTero complements the aligners because it is a faster and more precise method to take an imprint of the patients' teeth than the traditional physical impressions.  The dental professional will typically use the iTero hardware system, which includes a handheld wand, to scan a patient's mouth and create digital imagery of patients' teeth.  The scan is immediately transmitted to Align's manufacturing facility, instead of having to physically ship the imprints, cutting down the sale lead time cycle.  The Company generates revenue from the initial sale of the iTero system and related products, but it does not generate revenue from the iTero scans themselves.  An example of the Company's iTero system is depicted below:



28.     Using iTero to scan patients is critically important to Align because it provides the Company with up-to-the-minute information regarding its sales pipeline.  According to a May 23, 2018 presentation given by Yuval Shaked (Senior Vice President and Managing Director, iTero Scanner and Services Business) Align wanted to install iTero "Everywhere in the World," have a "Scanner in Every Chair," and have dentists "Scan every patient—at every visit."  This is because "More iTero Scans = More Invisalign Cases."   The Company conducted a study showing "statistically significant growth in Invisalign cases [] for practitioners utilizing iTero scanners with Invisalign treatment."  In fact, Align saw an "80% lift in acceptance rates" when iTero was used and noted that a "Key Growth Driver[]" of the increase in scans was "International Expansion."



29.     Align started using iTero in China in April 2018, noting that it was a "Huge opportunity" and that the Company had made "heavy investments" there.  The number of cases submitted via iTero in China skyrocketed from 0% before April 2018 to 46% by December 2018.  As of December 31, 2019, over 73% of Invisalign case submissions in China were submitted via digital scans for its entire business.  Internationally, 65% of cases were submitted through iTero.  For the remainder of Invisalign cases that are submitted by taking physical impressions of teeth using a soft putty (as opposed to an iTero scan), Invisalign technicians still scan those impressions at the manufacturing facility, giving Defendants immediate insight into the sales pipeline for those aligners as well.

30.     After taking the iTero scan, the dental professional will then send it to Align, which will use it to develop a treatment plan for the use of Invisalign.  The treatment plan is called a ClinCheck, which simulates a patient's expected tooth movement over the course of treatment.  Once Align develops the treatment plan, it sends it to the dental professional, who can then use iTero to show patients how their teeth will look at the end of treatment.

31.     After the patient approves the treatment plan and purchases Invisalign, Align uses the scan and data underlying the simulation to create a series of Invisalign aligners that the patient will use during the course of treatment to correct the malocclusion.  To create the aligners, Align pressure-forms polymeric sheets over molds of the patients' dental arches.  The aligners are shipped to the treating doctor, who gives them to the patient periodically during follow-up appointments.

32.     A patient wears Invisalign in "stages."  A patient will typically wear an Invisalign aligner for one to two weeks during which time the aligner will slightly adjust a patient's teeth. Once that adjustment is complete, the patient will replace the current aligner with a new aligner that will further adjust the patient's teeth.  The process repeats until the final position of the teeth is achieved.

33.     Align offers different Invisalign products to treat varying degrees of malocclusion. For the mildest cases, the Company offers an Invisalign Express Package which requires seven stages.  Increasing in the severity of malocclusion, Align also offers the: Invisalign Lite Package (14 stages); Invisalign Go Limited Movement (GP) (20 stages); Invisalign Moderate Package (20-26 stages); and Invisalign Comprehensive Package (as many stages as required).  Align sells Invisalign in "cases" that include the series of aligners intended for the patient.

**2.     Prior to the Class Period, Align's Invisalign Growth Began to Slow in the U.S. While China Growth Accelerated**

34.     For decades, Align was the lone major player in the clear aligner space, protected by an IP portfolio that it enforced vigorously in court.  The Company's virtual monopoly and first-mover advantage served it well.  As of February 2002, Align treated roughly 44,000 patients with Invisalign.  Fifteen years later, in 2017, the Company shipped 976.4 million Invisalign cases. Indeed, the Company's growth in "Total Case Volume" (total of number of cases shipped) was robust, and that growth in recent years was concentrated in Align's international markets as set forth in the tables below.

| TOTAL INVISALIGN CASE VOLUME (In Millions)[1] | | | | | | |
|---|---|---|---|---|---|---|
| Year | 2013[2] | 2014[3] | 2015[4] | 2016[5] | 2017[6] | 2018[7] |
| Americas | 313.9 | 338.5 | 398.4 | 464.5 | 621.9 | 780.7 |
| International | 108.5 | 139.5 | 184.8 | 244.7 | 354.5 | 499.9 |
| Total | 422.4 | 478.0 | 583.2 | 709.2 | 976.4 | 1,280.6 |

| TOTAL INVISALIGN CASE VOLUME Annual Growth | | | | | | |
|---|---|---|---|---|---|---|
| Year | 2013[8] | 2014[9] | 2015[10] | 2016[11] | 2017[12] | 2018[13] |
| Americas | 13.4% | 7.8% | 17.7% | 16.6% | 33.9% | 23.6% |
| International | 25.0% | 28.6% | 32.5% | 32.4% | 44.9% | 45.0% |
| Total | 16.2% | 13.2% | 22.0% | 21.6% | 37.7% | 31.2% |

35.    In 2017, however, approximately 40 of Align's key patents began to expire, creating an opening for competitors to enter the market.  This was just "the first group [of patents to expire] in what is expected to be an average of 23 expirations a year through at least 2028,"

---

[1] Case volume data represents the number of clear aligner case shipments by region.  As of 1Q2018, Align's Americas region includes North America (the U.S. and Canada), and LATAM. Align describes LATAM's contribution to the Company's overall results as "immaterial."  Prior to 1Q2018, the total Invisalign Case Volume metrics represents case shipments in "North America," as reported by the Company in the financial statements it publicly filed with the SEC. The International region includes EMEA and APAC.

[2]   *See* Align's 2013 Form 10-K, filed February 28, 2014, at 37.
[3]   *See* Align's 2014 Form 10-K, filed February 26, 2015, at 38.
[4]   *See* Align's 2015 Form 10-K, filed February 25, 2016, at 37.
[5]   *See* Align's 2016 Form 10-K, filed February 28, 2017, at 38.
[6]   *See* Align's 2017 Form 10-K, filed February 28, 2018, at 38.
[7]   *See* Align's 2018 Form 10-K, filed February 28, 2019, at 38.
[8]   *See* Align's 2013 Form 10-K, filed February 28, 2014, at 37.
[9]   *See* Align's 2014 Form 10-K, filed February 26, 2015, at 38.
[10] *See* Align's 2015 Form 10-K, filed February 25, 2016, at 37.
[11] *See* Align's 2016 Form 10-K, filed February 28, 2017, at 38.
[12] *See* Align's 2017 Form 10-K, filed February 28, 2018, at 38.
[13] *See* Align's 2018 Form 10-K, filed February 28, 2019, at 38.

according to an article *Forbes* published on April 25, 2017 titled "Out of Silicon Valley, A Billion-Dollar Orthodontics Business Built with Plastic and Patents" ("*Forbes* Article").

36.     As the patents expired, large companies with deep pockets began to compete directly against Align and offer clear aligners of their own, including 3M Company, Henry Schein, Inc., and Dentsply Sirona Inc.  According to an analyst report issued by Northcoast Research on May 10, 2018, each of these companies sold aligners at prices significantly lower than Align.  At the time, the cost of an Align comprehensive Invisalign package was $1,829.  Henry Schein priced its full SLX Clear Aligner treatment case at $1,450; 3M priced an unlimited number of its Clarity aligners at $1,584; and Dentsply Sirona offered an unlimited number of its SureSmile Aligners for $1,695.  In addition to these new entrants, the FDA has approved 33 new companies to print clear aligners since 2018, significantly eroding Align's competitive advantage and pricing power.  These new companies began to make products that competed with Align in the U.S. at as little as half the price, using e-commerce and telemedicine to cut costs.

37.     The entry of these new competitors in the U.S. placed significant pressure on Align's sales.  In 2018, the Company shipped 780.7 million cases of Invisalign in the Americas, representing growth of 23.6% over the prior year, down from 33.9% in 2017.  The Company's growth slowed despite steep promotional programs offered by Align to drive sales in the second half of 2018.  While the average sale price ("ASP") for Invisalign in North America was $1,290 in 2Q2018, in 3Q2018 the ASP declined roughly $100 per case to $1,199, about 8% in just that quarter.  And compared to the prior year when the ASP had been $1,334, the decline was 10%.

38.     But despite the slowing growth and lower ASP in the Americas, growth in international markets continued unabated.  In 2018, the Company shipped 499.9 million cases of Invisalign internationally, representing growth of 45% over the prior year.  In addition, the Company's ASP in international markets was higher than the Americas in 2Q2018 ($1,425 compared to $1,290).  And the ASP decline in international markets was less severe than in the U.S., from $1,425 in 2Q2018 to $1,340 in 3Q2018, representing a decline of just 6.0% over the prior quarter.

39.     The reason the Company's international growth outpaced the U.S. was largely because of increased Invisalign sales in China. Align began sales in China in 2011 when it opened its first office in Shanghai, and it quickly become the Company's second-largest market behind the U.S., representing approximately 9% of Align's total revenues. While representing 9% of total revenues, the growth in China was so significant that it represented 17% of the Company's total revenue growth in 2018. The number of Invisalign cases Align shipped in China increased 88% on average, year-over-year, between 2013 and 2017. In 2018, that growth increased to 91%.[14] Outside of China, APAC growth of Invisalign cases was approximately 25%, demonstrating the critical importance of China's growth to APAC and Align as a whole.[15] In APAC (including China), sales growth of Invisalign cases averaged 39% in 2016, 52% in 2017, and 55% in 2018.

### 3.     Growth Slowed Substantially in 3Q2018 in North America

40.     On October 24, 2018, Align reported earnings for 3Q2018 and revealed that the Company's growth and ASP had declined due to a "combination of promotional programs" in North America. Morici noted that Align had experienced a "shift towards lower ASP non-comprehensive products[,] [s]ome of which is tied to promotions." Despite the decline in North America, Hogan touted "a very strong quarter for APAC" (which includes China) "with record shipments for all country markets except Korea," which "saw continued strength from international regions, especially Asia Pacific, which is our second largest region after the Americas in Q3." The announcement of the slowing growth and lower ASP caused a dramatic 20% decline in Align's share price in a single day, from $290.83 on October 24, 2018 to $232.07 on October 25, 2018.

41.     Soon after this stock drop, reports emerged that China's economy was slowing due, in part, to the trade dispute with the U.S. On December 19, 2018, *Reuters* reported that China's economic "growth is likely to slow to 6.2[%] in 2019 from an expected 6.5[%] [in 2018] as headwinds increase due to its trade dispute with the United States." *Reuters* explained that

---

[14] William Blair Report, January 14, 2019, "Examining China Exposure and Fourth-Quarter Preview"
[15] *Id.*

"Growth in Asia's powerhouse economy slowed to 6.5 percent in the third quarter [of 2018], the weakest pace since the global financial crisis.  Indications are that momentum is likely to come off further in the current quarter and next year, with data last week showing surprising softness in November factory output and retail sales."  And in October 2018, the International Monetary Fund cut its forecast on China's economic growth from 6.4% to 6.2%, which would then be the slowest rate of growth in 28 years.  These reports took on increased significance because of China's growing importance to Align's revenue growth as that growth declined in North America.

### 4.    China Becomes Critical to the Company and Wall Street Analysts

42.    In light of China's increased importance, Wall Street analysts focused on the region's performance.  On January 14, 2019, William Blair issued a report on Align titled, "Examining China Exposure and Fourth Quarter Preview."  The report warned that while growth had reached "very elevated levels over the past year [2018]," "concerns have ratcheted up of late about slowing growth in China, and whether Align could be at risk," which had contributed to "significant underperformance of late."  The concerns about China were the result of the "worsening trade dispute" with the United States and its overall impact on the Chinese economy.

43.    Indeed, revenue growth year-over-year in China had (i) remained steady at about 70% in the first three quarters of 2017, (ii) accelerated to a torrid pace of about 100% between 4Q2017 and 3Q2018, and (iii) tapered down to slightly over 70% in the fourth quarter of 2018.  The following tables show that progression.[16]

---

[16] UBS Report on Align, January 30, 2020, "4Q19 Wrap: How Big IS China?"

| ALIGN CHINA REVENUE AND GROWTH IN 2017 AND 2018 (USD In Millions) | | | | |
|---|---|---|---|---|
| **Period** | **1Q2017** | **2Q2017** | **3Q2017** | **4Q2017** |
| China Revenue | $12.7 | $19.5 | $27.0 | $22.5 |
| China Revenue Growth y/o/y | 70.9% | 74.4% | 70.6% | 86.4% |

| **Period** | **1Q2018** | **2Q2018** | **3Q2018** | **4Q2018** |
|---|---|---|---|---|
| China Revenue | $25.6 | $38.4 | $52.9 | $38.9 |
| China Revenue Growth y/o/y | 101.3% | 97.6% | 96.1% | 72.6% |

44.     The William Blair report in January 2019 thus explained that "it [was] reasonable to expect some slowing for Align in both the U.S. and China markets given their very elevated levels over the past year [of about 100%].  But given the low level of market penetration for clear aligners, and the ramp up of some key new offerings like mandibular advancement in the United States and iTero in China, we expect the company's revenue and unit growth to hold up well in the coming year." William Blair "believe[d] [that] the ***current unit growth [in China was] about 67%***" and that the ***"implied 2019 case growth estimate for China [was also] 67%."***  William Blair's analysis ostensibly turned out to be correct for 4Q2018 and 1Q2019, when Align reported revenue growth y/o/y in China of 72% and 66%, respectively.

45.     Echoing William Blair, Evercore issued a report on January 17, 2019, emphasizing that "despite recent worries regarding the Chinese economy and consumer spending, Chinese consumer confidence numbers have so far held up, pointing to likely continued strong demand in what is [Align's] second largest market."  Evercore also examined the risk of a new competitor entering the market in China, the Straumann Group, concluding that "China's attractiveness as a clear aligner market is undisputable.  Clear aligners have been growing at double digit rates for a number of years … we estimate that [Align] currently has only ~7.5% market share, pointing to plenty of room for multiple international players in this market."

46.     On Align's next earnings conference call for 4Q2018 held on January 29, 2019, the Company played to Wall Street's continued focus on China by emphasizing its critical importance with a drumbeat of references to that market.  Hogan explained that the Company had achieved "record revenues of nearly $2 billion and had over 1.2 million people start treatment with Invisalign clear aligners" driven, in part, by "record Invisalign volume in almost every country market [in APAC] led by *China*, Japan, ANZ."  Hogan added that, (i) during 4Q2018, the Company "trained 1,530 new doctors in APAC, of which half were in *China*," (ii) for 2018 "Invisalign volume from the international doctors [had] increased 45% led by growth from *China*," and (iii) case growth in APAC was "up 49.3% year-over-year with record Invisalign volume in almost every country market led by *China*, Japan, ANZ."

47.     Hogan then emphasized that despite Align's "record results," the Company was "still very clearly underpenetrated in APAC overall and specifically in *China*.  As the second largest market for Align, *China* represents enormous growth potential."  Hogan likewise explained how in 4Q2018 the Company "began fabricating Invisalign aligners in our new manufacturing facility in Ziyang, *China*," which was Align's "first aligner fabrication facility outside of Juarez, Mexico."  And, according to Hogan, "[o]ver the next year, we will continue to build on our manufacturing capabilities in Ziyang and ramp up production to serve the rapidly growing *Chinese* market."  An expanded presence in China was critical because the "ability to expand and drive penetration across the region relies on [Align's] ability to be closer to doctors and their patients, communicate in local language, and as much as possible, operate like a local company."

48.     When an analyst from Stifel Nicolaus & Company (Jonathan Block) asked Hogan on the 4Q2018 earnings call about Hogan's "thoughts on the North American ortho weakness," Hogan deflected attention from the sagging North America market by pointing to China.  Hogan characterized the weakness as a "blip" and said that in "APAC, again, we see strength, [w]e've seen strength in *China*."  A Credit Suisse analyst (Erin Wilson) then asked Hogan about "fundamental demand trends in China given the broader macro dynamics" and the "competitive landscape and how that's evolving there."  Hogan responded that "[f]rom a *China* standpoint, look, our demand there has been great…it's a really underpenetrated marketplace.  And so—and

there's a lot of demand for our product line.  So our manufacturing investments we're making there, our treatment planning, all those things that make us a local company, we think will allow us to really penetrate that market at a higher rate.  So look, I mean, we're not numb to the international scene right now, where people are concerned about **China** demand.  ***We don't have anything to report*** right now that would say that we have a diminishing or a paranoia over **China** demand as we go into 2019."

49.     Likewise, SVB Leerink LLC analyst Richard Newitter insisted and asked Hogan once again essentially the same question: "the opportunities are enormous, including your growth rate in that region, [which] haven't really shown any slowdown.  But can you just talk a little bit about…the macro slowdown in **China** in the consumer discretionary realm?"  In response Hogan was unequivocal:

> [L]ike I mentioned before, Richard, this is—the growth that we saw throughout 2018 was really strong in **China**.  I mean, obviously, we're making these investments in **China**.  It's a commitment.  They are our second largest country in the world right now.  The under penetration, the opportunity there is huge.  Look, I mean we're up with global events.  We see the issues going on with **China** and United States.  And hopefully, they'll come to a trade deal sooner or later…But it also makes me feel good that we have a good insurance policy in the sense of the trade dynamics between the two countries, too.  So right now, again, we haven't seen what other companies are reporting…But what we've seen right now in the growth rates and what we've been experiencing, right now, we're looking for a good 2019 in **China**."

> Newitter responded, "Excellent."

50.     In light of Hogan's positive statements about China on the 4Q2018 earnings call, Wall Street continued to focus on China and its importance to Align's business, earnings and growth.  Analyst firm Berenberg stated in a report issued on January 30, 2019 that "[w]e believe a premium multiple vs. peers is deserved given multiple upside drivers" including "potential in **China** and international markets."  In other words, Align's stock was more valuable compared to its peers, in part, because of growth in China.  In addition, Evercore wrote in a report the same day that the "Company still feels very under penetrated in APAC overall and specifically in **China**," and explained that Align "[w]ill continue to build manufacturing capabilities in Ziyang and ramp production."  What's more, Evercore singled out that Align was "[n]ot thinking about any major

competitive issues in 2019" and that the Company's main competitor in China, Angel Align, was not "throttling growth, not a lot of head to head" competition there.

51.     Similarly, in a January 30, 2019 report by Jefferies, the first "Catalyst[]" listed that would drive the Company's stock price was "Invisalign penetration in new greenfield int'l markets (*China*, Russia Middle East, India)." That same day, the first "Conclusion" William Blair reached in rating the stock "Outperform" was that "[m]anagement commentary also indicated that demand continues to be strong with no signs of an economic-related slowdown within its business—especially in *China*." And UBS put a finer point on the importance of China in a February 14, 2019 report which increased UBS' price target on Align stock from $230 to $275 per share, explaining that "we believe that ALGN's growth is going to become increasingly dependent on international revenues, particularly in *China*."

52.     Regarding iTero and the number of scans submitted electronically, Hogan highlighted on the 4Q2018 earnings call that "*China* went from zero to 45.9% in one year." Piper Jaffray picked-up Hogan's emphasis on China and iTero in an analyst report dated January 29, 2019, stating, "[n]otably, China scans increased from 0% at the beginning of the year to 45% of overall volume, which was much better than we expected and should be an indication of how healthy that geography is."

53.     Countering the positive news from China, on March 5, 2019, the Company announced that it had lost a major arbitration against a competitor named SmileDirectClub. The claims arose from 12 Invisalign stores, known as "Invisalign Experience Locations" that Align had opened in the U.S. beginning in November 2017. SmileDirectClub alleged that operating these stores breached a noncompete agreement between SmileDirectClub and Align. The arbitrator forced Align to close all 12 of its U.S. Invisalign stores by April 3, 2019 and enjoined the Company from operating new Invisalign stores or providing services related to marketing and sales of clear aligners in retail environments. As a result, Align announced on March 5, 2019 that it would "incur a material charge in the first quarter [of 2019]" because of "the financial impacts of closing its Invisalign stores" and because the arbitrator also forced Align to "divest[] its equity investment" in SmileDirectClub.

54.     The shuttering of Align's U.S. stores further increased the importance of growth in China for Wall Street analysts.  According to an Evercore report on March 5, 2019, "Management had cited the stores as a new area of growth" and the actions "to offset this…will be a key question for investors going forward."  SVB Leerink also wrote on the same day that Align "will now need to find another [direct to consumer] avenue…that can target new prospective aligner customers with the dual goal of keeping these customers in the orthodontic channel—a key aspect to the Invisalign store program."  William Blair similarly explained in a report issued that same day that the arbitrator's ruling "does remove a potential source of volume growth longer term, as Align will no longer be able to roll out retail stores until fourth quarter 2022 at the earliest.  As a result, we are adjusting our model for Align to remove 1% of case growth in the U.S. in 2019 and 2% of case growth in the U.S. in 2020 and beyond."  The news of the arbitrator's ruling and forced closure of Align's U.S. stores caused the price of the Company's stock to decline from $256.31 per share on March 4, 2019 to $239.22 per share on March 5, 2019, nearly 7%, and causing a market capitalization loss of approximately $1.4 billion.

55.     Despite the continued setbacks in the U.S., Align continued to pursue and tout its expansion efforts in China as a relatively untapped source of future growth.  *ChinaDaily.com* published a news article on March 1, 2019, quoting Tay, who reaffirmed that "China is our second largest market, and ***our fastest growing country market with approximately 70 percent annual growth rate***.  With the rising middle class and enhanced awareness of oral health, there are enormous opportunities in China.   We strongly believe that a digitalized workflow will revolutionize dental practices and patients' chairside experiences."

56.     On March 20, 2019, Align announced the opening of the Align University Training Institute in Shanghai, China, the Company's second training facility in the country (the first had opened in Chengdu in 2017).  According to Align, the Shanghai facility is a "major," "state-of-the-art facility" that "represents the company's commitment to clinical education and support for doctors in China."   The purpose of the facility was to "educate doctors and showcase the company's latest product and technology innovation in orthodontic treatment and digital dentistry"

and "provide training, clinical education programs, and the tools and process demonstration needed for doctors to adopt innovative technology and treatment options in their practices."

57.     Tay attended the opening of Align's Shanghai Training Institute and continued to proclaim the importance of China, stating, "[w]e see enormous potential in China with a growing demand for Invisalign clear aligners…As consumer demand grows, we want to ensure we provide our doctors with the latest innovation and training to deliver great outcomes for Invisalign patients, and ultimately more beautiful smiles.  This is another important investment we are making in China to provide localized training and support to our doctors, as we continue to lead the industry in clear aligners and digital dentistry."

58.     Given Tay's statement that the Company saw "enormous potential in China with a growing demand for Invisalign clear aligners," when China was the Company's "fastest growing country market with approximately 70 percent annual growth rate," the descriptor "growing demand" (and similar descriptors such as "tremendous growth (¶98), "drives higher and higher amount of Invisalign volume" (¶105), "great growth market" (¶88), and "a market that's growing significantly for us" (¶104)), denoted growth rates in the range of 70% for China.

59.     The Company's past performance in China further reinforced that these descriptors indicated growth rates in the range of 70% in China (¶¶43-44).  As described above, the revenue growth in China increased slightly above 70% year-over-year in the first three quarters of 2017, about 100% from 4Q2017 through 3Q2018, and 70% in 4Q18.  Accordingly, analysts understood during the Class Period that the Company's growth in China was continuing in the range of 70%. William Blair's "assumption" at the beginning of the Class Period was that "China case growth" was "66%" as set forth in the table below published at the end of the Class Period on July 25, 2019 in its report, "Second-Quarter Analysis; China, Competition Drive Lower Outlook."

Exhibit 2. 2019 China Case Growth Sensitivity Analysis

| China case growth: | Change in: | | |
|---|---|---|---|
| | Case Growth | Revenue | EPS |
| 79% | 0.9% | 0.8% | $0.07 |
| Prior assumption--> 66% | 0.0% | 0.0% | $0.00 |
| 53% | -0.9% | -0.8% | -$0.08 |
| 40% | -1.8% | -1.6% | -$0.15 |
| Current assumption--> 26% | -2.8% | -2.4% | -$0.22 |
| 13% | -3.7% | -3.2% | -$0.30 |
| 0% | -4.6% | -4.0% | -$0.37 |

Source: William Blair estimates

**B.    At the Beginning of the Class Period Defendants Knew, or Were Deliberately Reckless in Not Knowing, that Growth in China Had Materially Slowed**

60.    The allegations in this section are based on Lead Counsel's investigation, which included interviews with numerous Align former employees who provided information supporting Lead Plaintiff's allegations.  The Former Employees provided information on a confidential basis and are described below by job description, title, responsibility, and period of employment, thereby providing the detail required to establish their reliability and personal knowledge.  Allegations attributed to a Former Employee are referenced by the employee's "FE __" designation or job description.

**1.    Defendants Tracked Invisalign Sales and Were Routinely Provided Negative Data Showing Growth Had Materially Declined**

61.    Hogan, Morici, and Tay knew of, or were deliberately reckless in disregarding, the material decline in growth in China by the beginning of the Class Period.

62.    According to FE 1,[17] Hogan and Morici received specific information prior to and during the Class Period indicating a material decline in growth in China.  FE 1 knows this based on FE 1's personal knowledge and an analysis of sales in China that FE 1 conducted at the direction

_____

[17] FE 1 served as an Align Global Analytics Analyst from June 2019 until after the end of the Class Period and worked at Align's Morrisville, North Carolina office, which is the Company's U.S. headquarters.  FE 1 reported to Senior Manager of Global Analytics, Mike Sherwood.  Sherwood reported to Global Senior Director of Finance, Vishnu Hari, who reported to Vice President of Finance, Corporate Financial Planning and Analysis, Stefan Wiechers.  Wiechers reported to Morici.

1    of Senior Manager of Global Analytics, Mike Sherwood, and Vice President Finance, Corporate

2    & Investor Communications, Shirley Stacy, as discussed below.

3          63.     This analysis was partly based on sales pipeline data from iTero.  FE 1 explained

4    that Align used the information it received from iTero scans to determine the amount of Invisalign

5    cases it would sell in any given period.  The Company used SalesForce and an SAP information

6    system to track the number of scans performed and the actual sales of aligners to the dentists and

7    orthodontists following the scans.  According to FE 1, typically, there were two weeks between

8    when consumers were scanned for their devices and when the aligners were ordered.  If this two-

9    week lag time lapsed, the patient had "dropped off in the [sales] funnel" and generally would not

10   result in a sale absent significant promotional intervention from Align.  Once the lag time reached

11   90 days, Align assumed that the sale was completely unsalvageable, according to FE 1. Align

12   refers to the time in the sales funnel as an "aging" analysis, according to FE 1.  FE 1 further

13   explained that the data from iTero scans in China (and all of the Company's regions) fed directly

14   into the SAP system.

15         64.     This sales information was so critical to Align that it was sent to the Company's

16   most senior executives, including Hogan and Morici, on a periodic basis.  According to FE 1, the

17   Global Analytics team, of which FE 1 was a part, had access to the data from all the regions in

18   which Align operates.  It was responsible for "vetting" this data, pulling it directly from the SAP

19   system, and creating global, consolidated reports for Morici and Hogan.  FE 1 stated that Morici

20   and Hogan received the reports both monthly and quarterly.  According to FE 1, the monthly

21   reports were derived from PowerBI "dashboards" that FE 1 prepared specifically for Morici and

22   Hogan.  The dashboards were created by using a Sequel server to pull data from the SAP system.

23   The PowerBI system was used to present the dashboards which showed sales "trends over time"

24   and demonstrated changes in "revenue and volume" in terms of number of Invisalign cases sold

25   from one month to the next.  FE 1 explained that the PowerBI-dashboard based reports were

26   created in such a way that they allowed users to drill down on the revenue and volume to see, for

27   instance, revenue and volume by region and country, *or by week*.

28

65.     Importantly, according to FE 1, there was a specific PowerBI dashboard that showed the lag time between scans and sales of aligners, which also allowed users to similarly drill down by country and region.  FE 1 stated that the dashboard reports demonstrating lag time were published for the executives on a monthly basis, but the executives could drill down on the lag time data to the weekly standard of analysis.  FE 1 prepared the Power BI dashboard reports every month for Morici and Hogan.

66.     In addition to the monthly PowerBI reports, FE 1 also prepared quarterly reports in the form of PowerPoint presentations for Align's Executive Management Committee ("EMC").  FE 1 stated that the quarterly reports were emailed up the chain of the global analytics and finance group to Stefan Wiechers (Vice President of Finance, Corporate Financial Planning and Analysis) who then presented them to Hogan and Morici.  According to FE 1, the PowerPoint presentations included screenshots from the PowerBI monthly reports, and for both sets of reports, Hogan and Morici could drill down in the global data to specifically isolate data from China.

67.     Likewise, according to FE 4, who served as an Align Senior Data Analytics Specialist from prior to the start of the Class Period until after the end of the Class Period in the Company's San Jose, California executive offices, Align maintained a "giant database" that housed details on the scans Align completed from across the globe.  FE 4 similarly stated that PowerBI was a tool that was "licensed company-wide," so "anyone could access and use the tool."

68.     FE 3[18] also described how FE 3 logged onto a dashboard every day, which displayed data from Align's Salesforce system as well as production data, which showed how many aligners had been sold in each territory.  FE 3 had access to Invisalign sales data for China, and it was FE 3's understanding that Hogan, Morici, and Tay had access as well, because as one moved up the corporate hierarchy in Align, the amount of access to data increased.  According to FE 3, Hogan, Morici, and Tay could have logged on to the dashboard at any point in time to

---

[18] FE 3 served as a Manager of Advanced Analytics for Align from prior to the beginning of the Class Period until after the end of the Class Period.  FE 3 was based in the Company's Morrisville, North Carolina office and was responsible for evaluating the Company's sales data to determine whether it was meeting sales metrics.

determine the level of sales growth in China.  FE 3 further said that the ***dashboards automatically generated reports daily for all of Align's territories*** and that APAC's upper management had monthly meetings, during which sales results were discussed.

69.     FE 2[19] similarly stated that Align executives, including Hogan, Morici, and Tay, closely tracked the number of Invisalign cases the Company produced and sold.  According to FE 2, "there was no way they wouldn't know what production was," meaning the number of aligners currently being manufactured, and that executives knew this information "down to the day, down to the minute."  FE 2 knows this because Senior Vice President of Global Operations, Emory Wright, called FE 2 to yell at FE 2 whenever there was a manufacturing issue that occurred just an hour or two earlier.  FE 2 further stated that Tay "absolutely" knew what production levels were in China because "everything in China was under Julie Tay."  She was responsible for knowing every detail of the Company's performance in China, including manufacturing levels.

70.     FE 2 further described how the Company had a SAP information system which tracked Invisalign orders and that Defendants had access to that data.  The Company also maintained a Manufacturing Execution System which showed the aligners currently in production and Defendants had access to that data as well.  And FE 2 further described how the Company used SalesForce to track Invisalign sales.  Each of these systems also tracked orders and sales in China, according to FE 2.  FE 2 further noted that Align had a data warehouse that communicated with each of the various systems and that allowed executives to track key sales metrics.  According to FE 2, the data warehouse was in existence "for years" at Align and was available to the executives during the Class Period.  FE 2 explained that "everyone knew how many orders there were.  The only way they did not know is if they did not want to know."

71.     FE 2 also described how Hogan was "in the weeds" at Align and ran the Company like a "mom and pop shop."  Tay was also a micromanager, according to FE 2, and she treated the

[19] FE 2 was a Senior Project Manager, IT Infrastructure from prior to the beginning of the Class Period until after the end of the Class Period.  FE 2 worked out of the Company's Morrisville, North Carolina office and most recently reported to Vice President, Global Program Management, Mary Stepp.  Stepp reported to Align's Chief Digital Officer Sreelakshmi Kolli.

APAC region as "her own little company."  FE 2 reiterated that any assertion that Hogan, Morici, or Tay did not know the sales in China would be completely meritless.  Tay could likely tell someone "in two seconds" how many orders were submitted in China on any given day and the status of those orders.  FE 2 described how Tay "triangulated" data (¶82), meaning that she closely followed the orders submitted, work in progress, and orders shipped to dentists.

72.     Around the quarter-end close period for 2Q2019, as referenced above, FE 1 prepared an analysis of Align's 2Q2019 performance in China.  That analysis showed that Align's growth in China had declined to approximately 17% for 2Q2019.  Significantly, according to FE 1's analysis, there were clear, early indications as of April 1, 2019 that Align's growth in China had slowed based on the lag time, and that data was available to executives to monitor the decline via the PowerBI dashboard reports.  Rather than a lag time of two weeks or less between an iTero scan and a purchase (as was typical), Invisalign growth in China had slowed dramatically.  FE 1's analysis showed that 15% of Align's scans in China were 180+ days aged as of the end of 2Q2019.  This means that 15% of Align's scans in China had already aged 90 days as of April 1, 2019.  Accordingly, they were unsalvageable and would not result in a sale.  FE 1 further stated that the growth further slowed during the Class Period given that 20-25% of the Company's scans in China had aged 90 days by the end of 2Q2019.  In fact, FE 1's analysis understated the level of decline because the analysis stopped at 180 days, with that category of the analysis referenced as "180 days plus," meaning that over 15% of Align scans were stale even prior to April 1, 2019.

73.     FE 1 further explained that if Hogan and Morici "cared to check the dashboards," they would have seen the decline in China and the significant lag time from scans to sales of Aligners.  According to FE 1, the reports would have shown Hogan and Morici that Invisalign growth in China was down for 2Q2019 in the first month of the quarter and as of April 1, 2019, and that growth remained at depressed levels during the remainder of the quarter.

74.     Confirming FE 1's account, according to FE 2, there was no way that Hogan, Morici and Tay would not have known the slowing trend in China during 2Q2019.  According to FE 2, "It was not like at the end of the quarter, the executives suddenly" had access to or looked at the data and said, "Oh my gosh, that is so crazy."  To the contrary, FE 2 described how the

executives closely tracked and had access to all relevant data at all times during the Class Period. Indeed, FE 2 stated that "[t]here is no company that goes a whole quarter" without tracking sales, and as described above, Align had several systems that it used to track sales in China.

75.    Corroborating these allegations, according to FE 5,[20] Align's growth in China had been consistently falling short of its internal forecasts since at least October 2018.  As a member of the Company's Corporate Financial Planning and Analysis Division, FE 5 stated that FE 5 worked closely with the "C Suite" of executives at Align, including Morici, who was the head of FE 5's department.  FE 5 was involved in numerous meetings where Morici was present.  FE 5's work focused primarily on analyzing Align's global forecast in relation to actual financial results of operations and assessing how each of Align's geographic divisions' actual performance compared to target goals.  In that capacity, according to FE 5, FE 5 was highly familiar with the Company's China-related financial metrics and liaised frequently with members of Align's manufacturing and accounting departments.

76.    FE 5 explained how FE 5 compiled daily, weekly, and monthly financial reports for Hogan, Morici, and Tay, and other finance, sales, and marketing leaders.  These reports showed what each Align geographic region had shipped in terms of Invisalign cases (the number of units was reported directly from the Company's warehouses), new orders received for the reporting period, and what Align's forecasted numbers for these items had been.  According to FE 5, the reports were sent to Hogan, Morici, and Tay, as attachments to emails and were the predecessor to the "dashboards," which Align was developing during FE 5's employment (¶¶64-64, 68, 72-73).  Align's internal system distributed the reports to Hogan, Morici and Tay daily (for the daily reports), weekly (for the weekly reports) and monthly (for the monthly reports).  FE 5 stated that the "dashboard" was intended to hold all the data sent in the daily, weekly, and monthly reports.

---

[20] FE 5 served as a Finance Manager in Align's Corporate Financial Planning & Analysis Division from July 2018 through February 2019.  FE 5 worked out of the Company's headquarters in San Jose, California.  FE 5 reported to the Company's Director of Financial Planning and Analysis, Naga Kusima.

The idea of the dashboard was that the receiver would not have to download anything and could simply log in to access the information.

77.     FE 5 explained how during FE 5's employment (July 2018 through February 2019), growth in China fell below internal forecasts.  According to FE 5, Morici was aware of the missed internal forecasts and responded to the emailed financial reports (on which FE 5 was included) and stated that the results were "not acceptable."  In addition, FE 5 explained how Align was missing its internal targets in China despite initiating a rebate program there.  FE 5 vocalized her concerns in financial meetings at which Morici and others were present, telling them that Align was not going to meet its forecasted numbers.  FE 5 also said FE 5 was included on an email during 4Q2018 where Morici asked Tay about the reason Align missed its internal forecasts in China.   Tay responded that the miss was because of more competition.

78.     FE 5 also described how Align executives including Hogan and Morici participated at monthly EMC meetings at which they discussed the Company's financial data, current performance, and forecasted numbers, including China.  To facilitate the discussion, FE 5 prepared monthly financial reports that showed the amount of Invisalign cases being shipped in each geographic region, the current month's performance, forecasted performance, and Align's profit. The report was broken down by region, including China.  According to FE 5, the EMC meetings were one of the "main financial reviews" that Align performed each month.

79.     FE 2 similarly explained how Align had an EMC which reported to Hogan.  Kolli, to whom FE 2 indirectly reported, was on the EMC.  Tay and Morici were also on the EMC, with Tay responsible for the Company's operations and performance in APAC and China.  According to FE 2, the EMC met quarterly at different locations and lasted two days.  The locations included the Company's Morrisville, North Carolina office, as well as Align's San Jose corporate headquarters.  FE 2 knows this because FE 2 was responsible for preparing weekly reports to the EMC members, including Kolli, Hogan, Morici, and Tay, who attended the EMC meetings.

80.     In addition to EMC meetings, FE 6[21] explained that every quarter, Align held a meeting known as an "all hands meeting" at either the Company's California headquarters or at its U.S. headquarters in North Carolina, depending on where the executives were at the time.  The meetings typically involved Hogan speaking to employees about the state of the Company and Morici was frequently present as well.  According to FE 6, in July 2019, right after the 2Q2019 results had been published, the Company held such a meeting in North Carolina at which Hogan presented and Morici attended.  FE 6 stated that the July 2019 "all hands meeting" took place in a large room at Align's U.S. headquarters known as the "Innovation" room that was well-known within the Company because it was such a large space.  FE 6 explained that at least 300 people attended the "all hands meeting."

81.     FE 6 recalled Hogan stating at the July 2019 "all hands meeting" that Align's growth in China had slowed for 2Q2019 and that Hogan told the attendees that it slowed because of the "Chinese market cooling," the "aesthetics market" (*i.e.*, the market for beauty products) cooled as well, and because of competition within China.

82.     Defendants also routinely visited China and Align's facilities there to gain further insight into the business.  Hogan stated on July 24, 2019 with Morici present that "[w]e were in Asia last week."  Tay likewise explained during an April 21, 2019 interview with Organisation Solutions that she has a "scheduled time to visit China…it's a must have...it's built into the rigor of running the business."  Tay also explained her hands-on management style and how she "like[s] to triangulate methods.  I like to triangulate information.  So when somebody tells me this is what it is, I like to go out and have a look and get a sense of it."

---

[21] FE 6 served as Senior Trainer for Marketplace Development at Align from October 2018 through September 2019, and worked at the Company's U.S. headquarters in Morrisville, North Carolina. FE 6 reported to Senior Director Matthew Miller, Director Rob Maughan, and Manager Ryan Coyne.  FE 6's responsibilities included helping build-out the Company's retail storefront locations, which the Company was forced to close because of the arbitrator's ruling.

### 2. Hogan and Morici Admitted that the Growth Decline in China Was Apparent in June 2019

83.     Hogan and Morici admitted that they knew, and were personally involved in tracking, Align's growth of Invisalign sales in China during the Class Period when they acknowledged on the 2Q2019 earnings call on July 24, 2019 that the decline in growth had been apparent in June 2019, the same month that Align had touted that it was driving "higher and higher amount[s] of Invisalign volume" in China.

### C. Actionable False and Misleading Statements and Omissions

84.     For the avoidance of doubt, all the statements and omissions that Lead Plaintiff alleges to be actionably false and misleading are included in this section titled "Actionable False and Misleading Statements and Omissions." Lead Plaintiff is not alleging that any statements or omissions excluded from this section are actionably false and misleading. The actionable false and misleading statements and omissions alleged in this section are all statements and omissions of present fact and not forward-looking.

### 1. False and Misleading Statements and Omissions in the April 2019 Earnings Call and Form 10-Q Filed in May 2019

85.     The Class Period starts on April 25, 2019, which is the first trading day after Align issued a press release to report earnings for its first quarter of 2019 and held a conference call to discuss earnings results on April 24, 2019 ("April 2019 Earnings Call"). On May 2, 2019, Align filed its quarterly report on Form 10-Q with the SEC which described the Company's financial results for 1Q2019 ("1Q2019 10-Q")

86.     On the April 2019 Earnings Call, Jonathan Block, an analyst at Stifel Nicolaus asked Hogan as follows:

> And then for 1Q '19, Simon's EMEA growth rate is now within 300 bps relative to Julie's [Tay in APAC], which I view is a good thing from a diversification standpoint and congrats to Simon, who I know has been chasing Julie for several years. But I'm just curious how we should think about that going forward, especially with the scanner that's technically newer in China. And Joe, you talked about the teen opportunity in China. We think that, call it closer to parity, Joe, is here to s[t]ay or is there anything unique in one market or the other teen iGo scanner that can cause APAC to sort of separate again?

In response, Hogan stated:

Jon, I think, first of all, you got to take cyclicality into that when you look at China and APAC versus EMEA. EMEA goes around the dark side of the moon right after the second quarter.  China has a really strong third quarter like they always do.  You get the Lunar New Year in the fourth quarter, you got a stronger EMEA in the first quarter.  So I think you can't do this kind of an apples-to-oranges comparison when you look at what Simon did this quarter.  So what I would take away from this one is you've got a continuing growth rate in EMEA and continuing penetration rates that are terrific.  ***We still have a great business in APAC from a growth standpoint overall.***  So I love the competition between those two. I'm cheering for them both, Jon.

87.     Hogan's statement, "We still have a great business in APAC from a growth standpoint overall," was (i) materially false and misleading because it created the false impression that the Company was continuing to grow in the range of 70% in China; and (ii) misrepresented and concealed that the Company's growth in China and APAC had substantially declined as of the beginning of the Class Period, and Align was facing a "consumer backlash," a "tougher consumer environment," and competition that was materially affecting growth in China as of the beginning of the Class Period.

88.     On the same April 2019 Earnings Call, John Kreger, at William Blair, then asked Hogan the following question:

So I'd like to go back to China. Can you just talk about the next steps there?  What you have to do to continue growing as quickly as you have?  We notice that the number of doctors trained in APAC and China declined a little bit compared to where it was at the end of '18.  Is that in any way related to the slowing economic outlook in your opinion or is that seasonality?  And can you just talk about how you expect the competitive dynamics in China to change now that Straumann is making an entrance via a partnership there?

In response, Hogan stated:

***China is a great growth market for us***.  We're manufacturing in China now.  We put treatment planning in Chengdu.  We handle all of our Chinese doctors right now out of China itself.  We have two wonderful training centers, one in Shanghai, one in Chengdu.  We feel very capable in China.  We lead in China, ***Straumann's move with third- or fourth- tier player from a clear aligner standpoint, I don't see that as dramatic effect on this market now or in the immediate future at all.***

Hogan's response satisfied Kreger, who then said, "Great."

89.    Hogan's statements that,

    a.    "China is a great growth market for us" was (i) materially false and misleading because it created the false impression that the Company was continuing to grow in the range of 70% in China; and (ii) misrepresented and concealed that the Company's growth in China had substantially declined as of the beginning of the Class Period, and Align was facing a "consumer backlash," a "tougher consumer environment," and competition that was materially affecting growth in China as of the beginning of the Class Period; and

    b.    "Straumann's move with third- or fourth- tier player from a clear aligner standpoint, I don't see that as dramatic effect on this market now or in the immediate future at all" was materially false and misleading because it misrepresented and concealed that competition was having a material declining effect on growth in China as of the beginning of the Class Period.

90.    Affirming Hogan's and Morici's statements on the 1Q2019 earnings call, the Company's quarterly report for 1Q2019 on Form 10-Q filed with the SEC on May 2, 2019 (signed by Hogan and Morici) stated the following: "Demand for our products may not increase as rapidly as we anticipate due to a variety of factors including a weakness in general economic conditions." This statement was materially false and misleading because while it purported to warn that "demand for our products may not increase as rapidly as we anticipate due to a variety of factors, including a weakness in general economic conditions," it falsely misrepresented and concealed that those factors, which were presented as mere risks, had already materialized and occurred at the time.  Invisalign sales growth in China had substantially declined as of the beginning of the Class Period and the Company was facing a "consumer backlash," a "tougher consumer environment," and competition that was materially affecting growth in China as of the beginning of the Class Period.

**2.    Wall Street Analysts Were Deceived by Defendants' Statements**

91.    Wall Street analysts were deceived by Defendants' assurances regarding the Company's continued success and growth in China.  Evercore issued a report on April 24, 2019 stating that "[Align] continued to deliver in 1Q" and cited as one of its "Key Model Drivers" that "APAC volumes up ~40% led by China, Japan, and Australia/New Zealand."

92.     Likewise, according to a report issued by Jefferies on April 25, 2019, the Company's "Catalysts" continued to be "Invisalign penetration in new greenfield int'l markets (China, Russia, Middle East, India)" with "APAC (+40%)" as a "1Q stand-out[]."  The "Key Takeaway," according to Jefferies, was that "the latest update adds conviction to our positive thesis: demand is strong." Jefferies "Maintain[ed]" its recommendation to "[b]uy" because "[a]fter two noisy Qs (3Q/4Q18), we saw no new cause for concern with 1Q showing strength in all the right places & expect stock sentiment to improve."

93.     Northcoast Research similarly published a report on April 25, 2019 noting that "[Align's] international clear aligner business posted 1Q19 revenue of $194.9 million, which was similar to our $194.8 million forecast.  In the quarter, international Invisalign case shipments remained strong (up 38.5% year-over-year to 144,260), led by continued favorable results in Asia Pacific (up 40.4% year-over-year) and EMEA (up 37.4% year-over-year).

### 3.     False and Misleading Statements and Omissions at the Bank of America Merrill Lynch Health Care Conference on May 14, 2019

94.     Beginning in mid-May 2019, Hogan and Morici attended a series of healthcare industry conferences hosted by the research divisions of various financial institutions.  They used these conferences to forcefully and repeatedly falsely tout the Company's growth in China.

95.     On May 14, 2019, Morici presented at the Bank of America Merrill Lynch Health Care Conference and said: "***China***…gets a lot of attention.  And rightly so, it's a huge market opportunity for us." Morici's statement was (i) materially false and misleading because it created the false impression that the Company was continuing to grow in the range of 70% in China; and (ii) misrepresented and concealed that the Company's growth in China had substantially declined as of the beginning of the Class Period, and Align was facing a "consumer backlash," a "tougher consumer environment," and competition that was materially affecting growth in China as of the beginning of the Class Period.

96.     Also on May 14, 2019, at that same conference, Bank of America Analyst Michael Ryskin asked Morici the following:

> Obviously, competition is another major question with the story.
> It's been that way for 5, 10 years now, where it always seems that

someone is saying competition is right around the corner.  They're
[] going to take all your share, and it's going to be a commoditized
product, and that was certainly very loud in 2018 as well.  It's been
about a year since some of these competitors launched their products
at AAO last year.  So, if you could just sort of provide an update on
[the various competitors]?

97.   Morici responded, in relevant part:

When we see competition, there's companies that come into the
space.  They have varying degrees of capability to come in.  There's
nothing that we've had to do from a pricing standpoint or market
standpoint where we have really felt that.  I mentioned the teen
space.  It's tough to come into a marketplace when you haven't
provided any aligners and really don't have the history and the
product to better move teeth in that manner.  Tough to come into
that space from a teen standpoint.  We really haven't seen as much
of that.  Where we do see more entrants is on the low stage, some of
the minimal tooth movement, whether it's through some of the
companies like a Straumann or companies like on the DTC, like a
SmileDirectClub.  You see more competitors in that space.  I should
mention though that we've seen competition, ***whether it's in China
or U.S. or other places, we've been competing against many of
these companies that I mentioned for a number of years and still
been able to grow as we have***.

Morici's statement that "whether it's in China or U.S., we've been competing against many

of these companies that I mentioned for a number of years and still been able to grow as we have,"

was materially false and misleading because it (i) falsely and misleadingly represented that

competition was not materially affecting Align's growth, and (ii) misrepresented and concealed

that competition, a "consumer backlash," and a "tougher consumer environment" were having a

material negative effect on growth in China, and that Align was growing at a materially lower rate

than 70% in China as of the beginning of the Class Period.

**4.   False and Misleading Statements and Omissions at the Stifel Dental &
Veterinary Conference on May 29, 2019**

98.   On May 29, 2019, Morici presented at the Stifel Dental and Veterinary Conference.

At the conference, Jonathan Block, an analyst at Stifel Nicolaus asked Morici the following:

So, I want to go over to international.  Growth rates continue to be
at a really impressive pace.  But you and I've talked about this, I
think coming off the Q1 call, rarely do I get many questions on
international, but just to sort of quantify, I think in the past couple
of years, 2017 and '18, the sequential growth was at 5%-ish from

4Q to 1Q.  This most recent quarter, it was up 1% 4Q to 1Q.  If it's fair to say the culprit, it seemed to be more APAC versus out of EMEA, and APAC seems to be in the crosshairs from a news flow perspective every day.  So, can you talk to us about what you're seeing specific to APAC. And if you guys had a little bit of hiccup there or it was something there that you may be able to pinpoint that led to the more modest sequential international growth.

In response, Morici stated that:

**_Well we see tremendous growth in APAC, in China in particular._**

99.    Morici's statement that, "we see tremendous growth in APAC, in China in particular," was (i) materially false and misleading because it created the false impression that the Company was continuing to grow in the range of 70% in China; and (ii) misrepresented and concealed that the Company's growth in China had substantially declined as of the beginning of the Class Period, and Align was facing a "consumer backlash," a "tougher consumer environment," and competition that was materially affecting growth in China as of the beginning of the Class Period.

100.    In response to Morici's false and misleading response referenced directly above (¶98), Block then asked Morici "When does that [training facility in China] come online?"  Morici responded:

That's come online now.  So, we have a new training there in Shanghai in addition to Chengdu and that's to meet the demands of our doctors that they want to be able to be trained. They want to be able to come with cases in hand to be able to grow their practices. **_So, we're seeing tremendous growth_**.  Timing of quarters, I know you get into whether we train a lot of doctors or we didn't or treatment planning or not, but we are very bullish on our growth internationally and in particular, APAC.  So we look at that as over the long term.  It's an area that we've invested in, and we expect to win.

Morici's statement, "we're seeing tremendous growth," was (i) materially false and misleading because it created the false impression that the Company was continuing to grow in the range of 70% in China; and (ii) misrepresented and concealed that the Company's growth in China had substantially declined as of the beginning of the Class Period, and Align was facing a "consumer backlash," a "tougher consumer environment," and competition that was materially affecting growth in China of the beginning of the Class Period.

101.   Block then asked Morici, "And so for the foreseeable future, you still see China being fastest growth, highest ASP that should remain in place for the next couple of years for us?" Morici responded:

> The dynamics in China are really good for us.  It is higher ASP. They start with a higher list price.  They have very complicated cases, comprehensive cases, and we've invested from a treatment planning to be in country, speak the same language, reduce the cycle time between having iTero in China.  We introduced that in second quarter of last year.  We went from almost no cases sent digitally to almost 50% of the cases sent digitally within China.  So the appetite for growth and new technology adoption in China has been great for us. And as you mentioned, the economics work well for us.

a.   Morici's entire response was (i) materially false and misleading because it created the false impression that the Company was continuing to grow in the range of 70% in China; and (ii) misrepresented and concealed that the Company's growth in China had substantially declined as of the beginning of the Class Period, and Align was facing a "consumer backlash," a "tougher consumer environment," and competition that was materially affecting growth in China as of the beginning of the Class Period.

b.   Morici's statement, "the dynamics in China are really good for us," misrepresented and concealed that the Company's growth in China had substantially declined as of the beginning of the Class Period, and Align was facing a "consumer backlash," a "tougher consumer environment," and competition that was materially affecting growth in China as of the beginning of the Class Period.

c.   Morici's statement that customers in China "have very complicated cases, comprehensive cases, and we've invested from a treatment planning to be in country, speak the same language, reduce the cycle time between having iTero in China," was materially false and misleading when viewed in the context of Morici's statement that "[t]he dynamics in China are really good for us," when, in fact, the lag-time, or aging, between iTero scans and sales in China significantly exceeded the typical two week period, the Company's growth in China had substantially declined as of the beginning of the Class Period, and Align was facing a "consumer

backlash," a "tougher consumer environment," and competition that was materially affecting growth in China as of the beginning of the Class Period.

        d.     Morici's statement that "the appetite for growth and new technology adoption in China has been great for us.  And as you mentioned, the economics work well for us" was materially false and misleading because growth in China had substantially declined as of the beginning of the Class Period, and Align was facing a "consumer backlash," a "tougher consumer environment," and competition that was materially affecting growth in China as of the beginning of the Class Period.

102.    Based on Morici's materially false and misleading statements, Block erroneously concluded, "[h]ere's my assessment, and this is coming from me, that you guys have done a phenomenal job of executing in the international market."

**5.    False and Misleading Statements and Omissions at the Jefferies Healthcare Conference on June 5, 2019**

103.    On June 5, 2019, Morici presented at the Jefferies Healthcare Conference.  At that conference, Jefferies analyst Couillard asked Morici:

> If we pivot over to China, which is your second-biggest market behind the U.S, sort of describe what the competitive landscape there looks like and some of the operational things you've already put in place as far as treatment planning and manufacturing and the importance of those to your business in China?

Morici responded, in relevant part,

> Yes, it's a good point.  I mean when you think about China growth, if I was on the stage a few years ago, China wouldn't be in our top five from a market standpoint, and it's solidly number two right now behind the U.S.  ***Great economics there from the standpoint that massive population, growing middle class, we have higher list prices, higher ASPs in China, very complicated cases, a lot of orthodontists that we sell to, selling more and more to hospitals***….

Morici's statement: "Great economics there [in China] from the standpoint that massive population, growing middle class, we have higher list prices, higher ASPs in China, very complicated cases, a lot of orthodontists that we sell to, selling more and more to hospitals," was (i) materially false and misleading because it created the false impression that the Company was continuing to grow in the range of 70% in China; and (ii) misrepresented and concealed that the

Company's growth in China had substantially declined as of the beginning of the Class Period, and Align was facing a "consumer backlash," a "tougher consumer environment," and competition that was materially affecting growth in China as of the beginning of the Class Period.

104.  Morici's response also included the following relevant part,

> …. [Manufacturing ramp-up in China will] continue through this year and into next and with the goal that we'll have China and Greater China manufacturing locally in China and then eventually perhaps Asia Pacific manufacturing. So it's a key strategy for us. It's supplying and taking care of our second-biggest market, *a market that's growing significantly for us* and a key strategy that we have to go from the centralized understanding that we have to be able to design and manufacture products and be able to make that transition to be more local.

Morici's statement that China is "a market that's growing significantly for us" was (i) materially false and misleading because it created the false impression that the Company was continuing to grow in the range of 70% in China; and (ii) misrepresented and concealed that the Company's growth in China had substantially declined as of the beginning of the Class Period, and Align was facing a "consumer backlash," a "tougher consumer environment," and competition that was materially affecting growth in China as of the beginning of the Class Period.

**6.    False and Misleading Statements and Omissions at the Goldman Sachs Global Healthcare Conference on June 11, 2019**

105.  On June 11, 2019, Morici presented at the Goldman Sachs Global Healthcare Conference. Analyst, Nathan Rich, asked Morici the following question:

> I wanted to move over to China, obviously, your second largest market. You've done very well there. iTero has been on the market there for I think a year. I think you had disclosed that over 40% of the cases that you're now getting from China are digital through a scanner. So could you maybe just talk about what the installed base looks like? What kind of uptake you've seen with iTero there? And then have you seen the sort of usual increase in Invisalign utilization once you place a scanner into a practice in that market like -- similar to your experience in the U.S.?

In response, Morici stated:

> Yes. China follows a similar practice as in the U.S. and so on, where having a scanner and having a scan will lend itself to more Invisalign volume.

* * * * *

But China is no different from the standpoint that when you have an iTero and you really include that as part of their digital workflow and ecosystem, ***that drives higher and higher amount of Invisalign volume.***

Morici's response was materially false and misleading because it materially misrepresented and concealed that the percentage of scans that resulted in sales was substantially lower than in the in U.S. and that the time between a scan and sale had dramatically increased in China.  Morici's response was also false and misleading because it misrepresented and concealed that the Company's growth in China had substantially declined as of the beginning of the Class Period, and Align was facing a "consumer backlash," a "tougher consumer environment," and competition that was materially affecting growth in China as of the beginning of the Class Period.

**D.     Align Discloses On July 24, 2019 That Growth Plummeted in China**

106.     Less than two months after Morici told investors on May 29 that the Company was experiencing "tremendous growth" in China, Align revealed that growth had plummeted.  On July 24, 2019, after the market closed, Align announced its financial results for 2Q2019, which ended on June 30, 2019.  Specifically, Align reported that it sold just 371,000 Invisalign cases in 2Q2019, less than the 380,000 to 385,0000 cases that the Company represented it would sell.  In addition, the Company reported that for APAC, 2Q2019 Invisalign sales increased just 33% year-over-year—far less than the 40.4% growth that the Company achieved in 1Q2019 and a fraction of the 58.7% sales growth that APAC achieved in 2Q2018.

107.     According to Hogan, the disappointing Invisalign case shipments were due to weak sales in China because of a "tougher consumer environment" there.  This was consistent with the internal discussions within the Company at the beginning of the Class Period but contrary to the public statements.  According to Hogan, "[w]hen we talk about this slowdown right now, part of it is -- a huge part of it is China."

108.     Hogan also reported that given the "uncertainty in China, our outlook for the third quarter reflects a more cautious view for growth in the Asia Pacific region."  Further, Morici stated that the Company's 2019 Invisalign revenue and volume growth would be at the low end of the

Company's long-term operating model target of 20%-30% growth, as opposed to the middle of the range.

109.   Analysts were shocked that the Company had not previously disclosed the decline in China given that Hogan and Morici had looked at these same analysts in the eye in May and June and trumpeted growth in that market.  Steven Valiquette from Barclays stated on the 2Q2019 earnings call, "[s]o not to get too granular in what transpired over the past 3, 4 months, but just coming back to the June quarter and case volumes for a moment . . . *you guys were at a lot of conferences through mid-June with the message that everything seemed okay*."

110.   Hogan responded as follows: "I think China was by far was one where—when you got to June and all, it was more difficult than what we had anticipated. . . It just didn't materialize." Hogan thus admitted that he had known about Align's declining growth in China during the Class Period and was hoping that sales in June would skyrocket and save the quarter, despite all internal evidence to the contrary.  Morici further confirmed that he had known about the declining growth, stating that "we had some slowdown primarily China, in June."  This is also even though Morici told investors in June that iTero was driving "higher and higher amount[s] of Invisalign volume" and was "growing significantly" there.  In other words, by Hogan's and Morici's own admissions, Align knew that sales in China had slowed at the same time that they made materially false and misleading positive statements about Invisalign sales growth in China.

111.   With serious skepticism about Hogan's and Morici's suggestion that Align's growth in China had begun to decline so dramatically only in June, Michael Ryskin, at BofA Merrill Lynch, asked:

> [w]e know roughly how big your China business is for you, so it shouldn't have been that meaningful an impact, especially [if]it was only 1-month dynamic.  So is there anything going on outside of China?  I mean is there anything that you can comment on in terms of your local presence there?  You've got the manufacturing site built out.  You got some of your other facilities that you're establishing there.  Any other dynamics in play besides just the June consumer sentiment?"

Morici parried the question stating that, "we looked at the demand that we saw, some of the pressure that we saw in June.  But it was around the consumer sentiment, like Joe said."  The

truth was that the Company's growth in China had materially declined by the beginning of the Class Period and Defendants knew it or were deliberately reckless in not knowing.

112.   The next day, on July 25, 2019, Hogan appeared on CNBC's Mad Money for an interview and explained that the Company was "expecting about 70% growth out of China and we achieved about 20%-30%" growth.  This is generally consistent (even if mildly exaggerated) with the analysis that FE 1 prepared regarding Align's declining growth rates in China for 2Q2019 showing 17% growth.  According to Hogan, "[i]t's just basically a consumer backlash right now, we feel, from a standpoint of making decisions on going ahead with aligners or not."  "Consumer backlash" was nothing other than a euphemism for plummeting sales.  And what Hogan misrepresented and concealed is that the internal aging data had shown Defendants this so-called "consumer backlash" by the beginning of the Class Period.

113.   In the wake of the Company's 2Q2019 earnings announcement, Wall Street analysts continued to express surprise regarding Align's declining growth in China, particularly when juxtaposed against the Company's positive statements during the Class Period.  UBS issued a report on July 25, 2019 that questioned Align's "visibility into their business given they . . . met with investors into June with what was perceived as a positive message."  According to UBS, "[t]he biggest delta to growth today and going forward remains China, which we estimate is ~10% of [Align's] cases and had been growing 100% into 2019 and ~80%+ in 1Q."

114.   Piper Jaffray reluctantly stuck to its "Overweight" weighing on Align stock on July 24, 2019, noting that there is "no point defusing a bomb after it's gone off" after the "slowdown in China."  Likewise, Credit Suisse issued a report on July 24, 2019 stating that "[Align's] most recent quarter was admittedly disappointing, where clear aligner case volume fell well short of expectations on a tougher consumer environment in China."  Barclays's report dated July 25, 2019 explained that "volumes still seemingly underwhelmed particularly with the international (China) business also coming in lighter than expected.  [Management] reiterated that China is a critical component to overall case volume and that the slowdown in that region is the reason for the significant step down in growth in the international segment."  And William Blair issued a report on July 25, 2019 tying the "underwhelming quarter with case volumes…to the Chinese consumer."

The report further explained how one of Align investors' "major concerns" was "at the forefront this quarter," "the impact of slowing growth in China on case starts…This is the first quarter that management has acknowledged pressure from [] a slowing China." William Blair concluded that now "we estimate that the implied China growth for full year 2019 is roughly 20% to 30%—a far cry from our estimate of 90% growth in this key market (the company's second-largest after the United States) the past three years."

115. The news of the declining growth in China caused the price of Align stock to drop approximately 27%, from $275.16 per share on July 24, 2019 to $200.90 per share on July 25, 2019, wiping out about $5.4 billion in shareholder value. The 27% decline represents Align's largest post-earnings decline in at least a decade.

**E.     Summary of Scienter Allegations That Support A Strong Inference That Defendants Knew, or With Deliberate Recklessness Disregarded, That Growth in China Had Materially Slowed**

**1.     According to Former Employees, By the Beginning of the Class Period Defendants Knew, or Were Deliberately Reckless in Not Knowing, that Growth in China Had Materially Slowed**

116. Lead Plaintiff incorporates by reference here the Section IV.B titled, "At the Beginning of the Class Period Defendants Knew, or Were Deliberately Reckless in Not Knowing, that Growth in China Had Materially Slowed."

**2.     Hogan and Morici Provided Knowledgeable, Detailed and Unequivocally Positive Responses to Analyst Questions About Growth in China**

117. Hogan and Morici repeatedly spoke about the sources and significance of the Company's growth in China and the factors that purportedly drove the growth, while dismissing the headwinds that the Company was facing there. For example, on May 29, 2019, in response to a question from Jonathan Block at the Stifel Dental & Veterinary Conference, Morici said, "Well we see tremendous growth in APAC, in China in particular," and reiterated that point in response to the immediately next question, "[w]e're seeing tremendous growth." Morici then spoke at length discussing Align's training facilities in Shangai and Chengdu, China's higher ASPs and "complicated cases," the introduction of iTero, and the opening of a new manufacturing plant in China and the cost differential with the plant in Mexico.

118.     On June 6, 2019 in response to a question from John Kreger, at William Blair, regarding the impact of the U.S. "trade disputes" with China, Hogan responded that "[w]e continue to grow there" because "[t]here is a lot of under-penetration there in the sense of what consumer demand is…So I feel regardless of what the trade dispute is or whatever, we can represent ourselves as a Chinese company now and it's still that way."  Likewise, on the 1Q2019 earnings call held on April 24, 2019, Hogan touted the Company's 40.4% year-over-year growth in APAC, "led by China" because the Company "had a strong uptick in teenage patients in Q1 due in part to a teen promotion in China."  What's more, Hogan and Morici represented in the Company's quarterly report for 1Q2019 that "[w]e continue to see growth from our international orthodontists and general practitioner ("GP") customers and are seeing more positive traction in the GP channel as we continue to segment our sales and marketing resources and programs specifically around each customer channel."

119.     Hogan and Morici assured investors that they knew about the Company's growth in China because that is what analysts were focused on as the main driver of Align's growth.  For instance, on the 1Q2019 earnings call, at the beginning of the Class Period, John Kreger, at William Blair, asked, "[s]o I'd like to go back to China.  Can you just talk about the next steps there?  What you have to do to continue growing as quickly as you have?  We notice that the number of doctors trained in APAC and China declined a little bit compared to where it was at the end of '18.  Is that in any way related to the slowing economic outlook in your opinion…?"  In response, Hogan continued to tell investors that "China is a great growth market for us."

120.     On May 14, 2019, BofA analyst Michael Ryskin asked Morici regarding the Company's manufacturing facility in China. Morici responded that the market in China "gets a lot of attention.  And rightly so, it's a huge market opportunity for us," while further explaining that the Company was able to "drive more volume" in China by "getting closer to our customers, being able to cut down on shipping times, being in their same time zone and closer to them is a huge benefit just as adding more salespeople to be closer to our doctors, provide that more direct contact with them."  Morici further discussed that, although Align has seen "competition" in China, it has "still been able to grow as we have."

121.    Hogan and Morici's precise and granular statements reflecting knowledge of all details and information concerning Align's sales and operations in China raises a strong inference that Defendants knew that growth had materially slowed in China or were deliberately reckless in not knowing.

### 3.    China Constituted Core Operations of the Company

122.    The Company's sales and growth of Invisalign in China constituted core operations of the Company.   Align acknowledged that China was its second-largest and fastest growing market, representing nearly 10% of the Company's revenues and 17% of revenue growth in 2018. Align's growth in China was obsessively watched and followed by Wall Street analysts and continuously championed by Defendants.   On May 14, 2019, Morici presented at the Bank of America Merrill Lynch Health Care Conference and said: "China…gets a lot of attention.   And rightly so, it's a huge market opportunity for us."

123.    This attention, for example, was reflected in a UBS report issued on July 25, 2019 stating that, "the China opportunity remains huge, perhaps as big as the US, with only one established player and others basically being blocked for two years or more, perhaps."   "We think China is currently 10% of cases [worldwide] and was growing north of ~80%, so ~30-40% of [Align's] growth was expected to come from this market.   The US represents ~55% of revenues and is growing mid-teens, suggesting 7-8 points of total company growth, or similar to what China was expected to contribute."

124.    In addition, the first item under Align's "Business Strategy" listed in its 2018 and 2019 10-K was "International Expansion" and "initiatives that will drive Invisalign treatment growth in our current and new international markets," including China.   Defendants frequently travelled to China and made significant investments in manufacturing and training facilities there. The fact that Invisalign sales and growth in China constituted core operations supports a strong inference that Defendants, who had access to all relevant data, knew that the Company's growth in China had materially slowed or were deliberately reckless in disregarding the facts available to them.

**4.      The Decline in Growth in China Was Massive**

125.      The massive decline in growth in China during the Class Period supports a strong inference that Defendants knew that sales had materially slowed in China or were deliberately reckless in not knowing.  Revenue growth year-over-year in China had (i) remained steady at about 70% in the first three quarters of 2017, (ii) accelerated strongly to approximately 100% between 4Q2017 and 3Q2018, and (iii) finally tapered down to slightly over 70% in the fourth quarter of 2018 and 67% in 1Q2019.  For 2Q2019, Hogan explained that the Company expected growth in China of roughly 70% but achieved growth of just 20-30%.  That Align's growth in China nosedived so dramatically in a period of just three months—which is inconsistent with the Company's prior results and internal expectations by significant orders of magnitude—supports a strong inference that Defendants knew of the material decline or were deliberately reckless in not knowing.

**5.      The Temporal Proximity Between the False Statements and the Material Decline in Growth Was Very Close**

126.      The close temporal proximity between Defendants' statements promoting Align's tremendous growth in China and the disclosure of that materially declining growth supports a strong inference that Defendants knew that growth had materially slowed in China or were deliberately reckless in not knowing.  Defendants repeatedly touted the Company's "tremendous" growth in China throughout the Class Period, culminating in Morici's statement on June 11, 2019 that use of iTero in China "drives higher and higher amount of Invisalign volume."  The temporal proximity of Defendants' misrepresentations to the revelation of the truth that Align had experienced a material decline in growth in China just six weeks later (from Morici's June 11 statement) further supports a strong inference that Defendants knew that growth in China had slowed, or were deliberately reckless in not knowing.

**6.      Align Executives Reaped Millions from Insider Sales**

127.      With knowledge, or deliberate recklessness in not knowing, that the Company's growth in China had materially slowed, Morici and Tay (the "Selling Defendants") sold over $6 million worth of their personal holdings of Align stock during the Class Period.  Morici's and Tay's sales represented 45% and 55%, respectively, of their total holdings.

128.     To evaluate the Selling Defendants' selling activity, Lead Counsel analyzed the publicly available trading data that is required to be reported to the SEC.  Lead Counsel compared the Selling Defendants' trades during the three-month Class Period to their trading activity during the three months immediately preceding the Class Period, beginning on January 21, 2019 and ending on April 25, 2019 (the "Control Period").  This analysis shows that the Selling Defendants' Class Period sales were extremely large, highly unusual, and wildly inconsistent with their prior trading history.  Specifically, while the Selling Defendants sold just 1,250 shares of their Align stock during the Control Period, the Selling Defendants collectively sold over 19,400 shares during the Class Period and did not purchase a single share of Align stock.

129.     Tay sold 17,060 shares of Align stock between May 8, 2019 and May 15, 2019— 55% of her personal holdings that were available for sale—and collected over $5.5 million in proceeds.  Tay executed her sales at an average share price of nearly $323 per share, close to the highest possible price during the Class Period.  Tay executed these sales while knowing, or with deliberate recklessness disregarding, that the Company's growth in China had materially slowed, and was facing a "consumer backlash," a "tougher consumer environment," and competition that was materially affecting growth in China as of the beginning of the Class Period.

130.     Morici sold 2,374 shares of Align stock on May 31, 2019—45% of his personal holdings that were available for sale—and collected over $681,000 in proceeds.  Like Tay, Morici conducted these sales at high prices, at an average price of nearly $287 per share, avoiding over $200,000 in losses, based on the closing price of Align stock on July 25, 2019.  Morici conducted these sales while knowing, or with deliberate recklessness disregarding, that the Company's growth in China had materially slowed, and two days after telling investors at the May 29, 2019 Stifel Dental & Veterinary Conference that Align was experiencing "tremendous growth in APAC, in China, in particular."

131.     The table below depicts the sharp contrast between the Selling Defendants' insider trading in Align stock during the Control Period and during the Class Period.

| | CLASS PERIOD | | | CONTROL PERIOD | | |
|---|---|---|---|---|---|---|
| | Shares Sold | Proceeds | Percentage of Holdings Sold | Shares Sold | Proceeds | Percentage of Holdings Sold |
| Julie Tay | 17,060 | $5,509,500 | 55% | 1,250 | $318,228 | 9% |
| John Morici | 2,374 | $681,129 | 45% | 0 | 0 | 0% |

132.    The publicly available trading data for the Selling Defendants that Align reported to the SEC does not represent that the sales were conducted pursuant to a Rule 10b5-1 insider trading plan or that any such plan was adopted prior to the Class Period.

133.    Significantly, each of the Selling Defendants reaped significantly more in proceeds from their illicit sales of Align stock during the Class Period than they earned in salary in 2018 and 2019.  Tay, who earned a base salary of $460,000 in 2018 and $495,000 in 2019, made over $5.5 million from her insider sales during the Class Period, which is 12 times her 2018 salary and 11 times her 2019 salary.  Morici, who earned $460,000 in 2018 and $500,000 in 2019, increased his salaries by about 1.5 times by selling over $681,000 of Align stock.  That the Selling Defendants earned more from selling their Align stock based on non-public information than they earned in salary further supports a strong inference of intentional or deliberately reckless misconduct.

### 7.    Corporate Scienter

134.    The Company possessed scienter for two independent reasons.  First, Hogan and Morici were senior executives with binding authority over the Company and acted within the scope of their apparent authority.  The scienter of Hogan and Morici is imputed to the Company.

135.    Second, Align's corporate scienter independently arises from (i) the state of mind of senior executives including Tay (regardless of the scienter of Hogan and Morici), whose intent can be imputed to the Company, and/or on (ii) the knowledge of senior executives who approved the statement in the 1Q2019 10-Q alleged herein despite knowing, or with deliberate recklessness disregarding, the statement's false and misleading nature.  It can be strongly inferred that senior executives at Align possessed scienter such that their intent can be imputed to the Company.  Given

the significance of the Company's growth in China to Align, the massive decline in growth, the extensive processes to track Align's sales and growth in China at all times, and the necessary involvement of numerous Align departments and personnel, additional executives unknown at this time and sufficiently senior to impute their scienter to Align also knew, or with deliberate recklessness disregarded, that growth in China had materially slowed during the Class Period.

## V.  LOSS CAUSATION

136.  Defendants' fraudulent conduct directly and proximately caused Lead Plaintiff and the Class to suffer substantial losses as a result of purchasing or otherwise acquiring Align common stock at artificially inflated prices during the Class Period.

137.  Defendants, through their materially false and misleading statements and omissions set forth above, misrepresented and concealed the truth that Align's growth in China had materially declined.  The misrepresented and concealed risks bear directly on Align's growth in China.

138.  On July 24, 2019, the misrepresented and concealed risks that revealed the false and misleading nature of Defendants' Class Period statements and omissions materialized.  The Company's July 24, 2019 announcement of Align's declining growth in China caused the Class to suffer losses and damages, which were foreseeable and caused by the materialization of the risks the Defendants misrepresented and concealed from investors.  The news of the declining growth in China caused the price of Align stock to decline 27%, from $275.16 per share on July 24, 2019 to $200.90 per share on July 25, 2019, erasing at least $5.4 billion in shareholder value.  The 27% decline represents Align's largest post-earnings decline in at least a decade.

139.  On July 24, 2019 Bloomberg published an article after the market closed, titled "Invisalign Maker Sinks on Soft China Sales, Slower Teen Growth."  According to the article, Align said a "tough consumer environment" in China caused it to miss its sales numbers for 2Q2019 Invisalign case shipments and remain "more cautious" on its outlook for APAC.  The article continued, "[s]hares of Align sank 23% in extended trading Wednesday [July 24, 2019], as third-quarter views for revenue and earnings also trailed analyst estimates.  If that decline holds through tomorrow's trading, it would the stock's biggest post-earnings decline in at least a decade."

140.    Also on July 24, 2019, after the market closed, Marketwatch published an article titled, "Align Technology stock plummets more than 20% as China sales woes hit earnings forecast."  The article said that "Align Technology Inc. [] shares plunged more than 20% in late trading Wednesday, after the company said that China sales were hurting and gave a weaker-than-expected forecast."

141.    On July 25, 2019, CNBC published an article titled "Invisalign maker falls short in China, but CEO says he's optimistic about summer sales," which quoted Hogan as stating that "[w]e were expecting about 70% growth out of China and we achieved about 20-30%."

142.    Also on July 25, 2019, CNN published an article titled, "China is hurting the braces market.  Align Technology's stock plunges more than 25%."  According to the article, Align Technology's "slowing demand in China was one of the primary reasons for the weak outlook."  And according to a report issued by UBS on January 28, 2020, "[w]hen growth in China slowed significantly in 2Q19 due to competitive and macroeconomic pressures, it prompted revenues revisions downward and caused a sell-off in [Align's] stock."

## VI.    INAPPLICABILITY OF STATUTORY SAFE HARBOR OR BESPEAKS CAUTION DOCTRINE

143.    The statutory safe harbor and bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements and omissions alleged herein.  The statements and omissions complained of herein concerned then-present or historical facts or conditions that existed at the time the statements were made.

144.    To the extent any of the untrue or misleading statements alleged herein can be construed as forward-looking, (a) they were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements, and the generalized risk disclosures Align or other Defendants made were not sufficient to shield Defendants from liability, and (b) the person who made each such statement knew that the statement was untrue or misleading when made, or each such statement was

approved by an executive officer of Align who knew that the statement was untrue or misleading when made.

## VII.  PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET DOCTRINE

145.    Lead Plaintiff is entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine.  At all relevant times, the market for Align common stock was efficient for the following reasons, among others:

a)    Align's common stock met the requirements for listing, and was listed and actively traded, on the NASDAQ, a highly efficient and automated market;

b)    The average weekly trading volume of Align's common stock was significant and amounted to 4,606,198 shares during the Class Period;

c)    As a regulated issuer, Align filed public reports with the SEC and the NASDAQ;

d)    Align was eligible to file simplified SEC filings;

e)    Align regularly communicated with the public through established market communication channels, including through the regular dissemination of news releases through major newswire services, communications with the financial press, and other wide-ranging public disclosures;

f)    Numerous securities and credit analysts followed Align and wrote reports that were published, distributed, and entered the public domain; and

g)    The price of Align common stock reacted quickly to news.

146.    Accordingly, the market for Align common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of Align common stock.  Under these circumstances, all purchasers of Align common stock during the Class Period suffered similar injury through their purchases at artificially inflated prices.  A presumption of reliance therefore applies.

147.    In addition, or in the alternative, Lead Plaintiff is entitled to a presumption of reliance pursuant to *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), and its progeny, because the claims asserted herein are predicated in part upon omissions of material fact that Defendants had a duty to disclose.

## VIII.    CLASS ACTION ALLEGATIONS

148.    Lead Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following proposed class: all persons and

entities who purchased or otherwise acquired Align common stock from April 25, 2019 to July 24, 2019, both dates inclusive, and who were damaged thereby.

149.    Excluded from the Class are: (i) Defendants and any affiliates or subsidiaries thereof; (ii) present and former officers and directors of Align and their immediate family members (as defined in Item 404 of SEC Regulation S-K, 17 C.F.R. § 229.404, Instructions (1)(a)(iii) & (1)(b)(ii)); (iii) Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof; (iv) any entity in which any Defendant had or has had a controlling interest; (v) Align's employee retirement and benefit plan(s); and (vi) the legal representatives, heirs, estates, agents, successors, or assigns of any person or entity described in the preceding categories.

150.    The Class is so numerous that joinder of all members is impracticable.  Lead Plaintiff believes that the Class members number at least in the thousands.  Throughout the Class Period, Align common stock had an average daily volume on the NASDAQ of approximately 1,018,563 shares.  As of July 26, 2019, Align had nearly 80 million shares of common stock outstanding.

151.    Lead Plaintiff's claims are typical of the claims of Class members.  All Class members are similarly situated in that they sustained damages by acquiring Align common stock at prices artificially inflated by the wrongful conduct complained of herein.

152.    Lead Plaintiff will fairly and adequately protect the interests of the Class.  Lead Plaintiff has retained counsel competent and experienced in class and securities litigation.  Lead Plaintiff has no interest that conflicts with those of the Class.

153.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  The questions of law and fact common to the Class include, but are not limited to, the following:

    a) Whether Defendants' conduct violated the federal securities laws, as alleged herein;

    b) Whether Defendants made any untrue statements of material fact or omitted to state any material facts necessary to make statement made, in light of the circumstances under which they were made, not misleading;

    c) Whether Defendants acted with scienter as to Lead Plaintiff's claims for relief under Section 10(b) of the Exchange Act;

d) Whether the Individual Defendants were controlling persons under Section 20(a) of the Exchange Act;

e) Whether and to what extent the prices of Align common stock were artificially inflated or maintained during the Class Period due to the misstatements and omissions complained of herein;

f) Whether and to what extent Class members have sustained damages as a result of the conduct complained of herein and, if so, the proper measure of damages.

154. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable.

155. There will be no difficulty in the management of this action as a class action. Class members may be identified from records maintained by the Company or its transfer agent(s), or by other means, and may be notified of the pendency of this action by mail and by publication, using a form of notice similar to that customarily used in securities class actions.

## IX.   CLAIMS FOR RELIEF

### COUNT I
### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### Against Align, Hogan and Morici

156. Lead Plaintiff incorporates ¶¶1-155 by reference as if fully set forth herein.

157. During the Class Period, Align, Hogan, and Morici made, disseminated, or approved the false and misleading statements specified above, which they knew or were deliberately reckless in disregarding were false and misleading in that the statements contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

158. Align, Hogan, and Morici violated § 10(b) of the Exchange Act and Rule 10b-5 in that they:

a) Employed devices, schemes, and artifices to defraud;

b) Made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

c) Engaged in acts, practices and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Align common stock during the Class Period.

159.   Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Align common stock.  Lead Plaintiff and the Class would not have purchased Align common stock at the prices they paid, or at all, if they had been aware that the market prices of those securities had been artificially inflated by Align's, Hogan's and Morici's false and misleading statements and omissions.

160.   As a direct and proximate result of Align's, Hogan's and Morici's wrongful conduct, Lead Plaintiff and the Class suffered damages in connection with their purchases of Align common stock during the Class Period.

**COUNT II**
**For Violation of Section 20A of the Exchange Act**
**Against Morici and Tay**

161.   Lead Plaintiff incorporates ¶¶1-155 by reference as if fully set forth herein.

162.   While Align's stock traded at artificially inflated and distorted prices, Morici and Tay personally profited by selling a total of more than 19,400 shares of Align stock while in possession of adverse, material non-public information about the Company, pocketing over $6.1 million in illegal insider trading proceeds, as detailed above.

163.   Lead Plaintiff purchased contemporaneously with Morici's sales, as set forth below:

| Morici's Sales | | | | Lead Plaintiff's Purchases | | |
|---|---|---|---|---|---|---|
| Defendant | Sale Date | Shares Sold | Price | Purchase Date | Shares Purchased | Price |
| Morici | 5/31/2019 | 2,374 | $286.92 | 06/03/2019 | 802.00 | $282.96 |

164.   Lead Plaintiff and all other members of the Class who purchased shares of Align stock contemporaneously with the sales of Align stock by Morici and Tay have suffered damages because: (1) in reliance on the integrity of the market, they paid artificially inflated prices as a result of the violations of Sections 10(b) and 20(a) as alleged herein; and (2) they would not have purchased Align stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by Defendants' violations of the Exchange Act alleged herein.

165.    By reason of the foregoing, Morici and Tay violated Section 20A of the Exchange Act and are liable to Lead Plaintiff and the other members of the Class for the substantial damages suffered in connection with their purchases of Align stock during the Class Period.

**COUNT III**
**For Violation of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

166.    Lead Plaintiff incorporates ¶¶ 1-155 by reference as if fully set forth herein.

167.    During the Class Period, the Individual Defendants acted as controlling persons of Align within the meaning of § 20(a) of the Exchange Act.  By reason of their positions of control and authority as officers of Align, the Individual Defendants had the power and authority to direct the management, policies, and activities of the Company and its employees, including its decision making process, and to cause the Company to engage in the wrongful conduct complained of herein.  The Individual Defendants were able to and did influence and control, directly and indirectly, the content of the public statements made by Align during the Class Period, including its materially false and misleading statements and omissions concerning the strength of the Company's growth in China and APAC, thereby causing the dissemination of the false and misleading statements and omission of material facts as alleged herein.

168.    In their capacity as senior corporate officers of Align, the Individual Defendants had direct involvement in the day-to-day operations and oversight of the Company.  Hogan and Morici signed certain of the Company's SEC filings during the Class Period and the Individual Defendants were directly involved in providing false information and certifying and approving the false statements disseminated by Align during the Class Period.  Given the Individual Defendants' senior executive positions at Align and involvement in its day-to-day operations and key strategic decisions, and access to material non-public information regarding the Company, particularly Align's business in China, the Individual Defendants acted as controlling persons of Align and influenced and controlled its decision-making process.  As a result of the foregoing, the Individual Defendants are controlling persons of Align within the meaning of Section 20(a) of the Exchange Act.

169.    As set forth above, Align violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.

170.    By virtue of their positions of controlling persons of Align and as a result of their aforementioned conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiff and the other members of the Class who purchased or otherwise acquired Align stock.  As detailed above, during the time that the Individual Defendants served as senior executive officers of Align, they were culpable for the material misstatements and omissions made by Align.

171.    As a direct and proximate result of the Individual Defendants' conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchase or acquisition of Align stock.

## X.    JURY TRIAL DEMAND

172.    Lead Plaintiff, on behalf of itself and the Class, hereby demands a trial by jury.

## XI.    PRAYER FOR RELIEF

173.    WHEREFORE, Lead Plaintiff prays for relief as follows:

a)    Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

b)    Awarding Lead Plaintiff and the Class damages, including interest;

c)    Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees; and

d)    Granting such other and further relief as the Court may deem just and proper.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Dated: August 4, 2020

Respectfully submitted,

By: */s/ Peter E. Borkon*
**BLEICHMAR FONTI & AULD LLP**
Peter E. Borkon (Bar No. 212596)
pborkon@bfalaw.com
555 12th Street, Suite 1600
Oakland, California 94607
Tel.: (415) 445-4003
Fax: (415) 445-4020

– and –

Javier Bleichmar (*pro hac vice*)
jbleichmar@bfalaw.com
Nancy A. Kulesa (*pro hac vice*)
nkulesa@bfalaw.com
Ross Shikowitz (*pro hac vice*)
rshikowitz@bfalaw.com
7 Times Square, 27th Floor
New York, New York 10036
Tel: (212) 789-1340
Fax: (212) 205-3960

*Counsel for Lead Plaintiff Macomb County Employees' Retirement System and Lead Counsel for the Putative Class*